**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANTHONY POWERS,** | : | **CIVIL ACTION** |
| | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **No. 19-4685** |
| | : | |
| **SOUTHEASTERN PENNSYLVANIA** | : | |
| **TRANSPORTATION AUTHORITY, et** | : | |
| **al.,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

**Goldberg, J.**                                                                          **June 23, 2021**

## MEMORANDUM OPINION

Plaintiff Anthony Powers brings claims of discrimination, hostile work environment, and retaliation on the basis of his gender, disability, and race against his former employer, Defendant Southeastern Pennsylvania Transportation Authority ("SEPTA"), and individual SEPTA employees, Defendants Michaeleen Benson, Marlene Waddell, and Arthur Locks (collectively, the "Individual Defendants"). Before me is Defendants' partial motion to dismiss the Third Amended Complaint and motion to strike Plaintiff's demand for punitive damages against the Individual Defendants. For the following reasons, I will grant in part and deny in part Defendants' motion.

## I.    FACTUAL BACKGROUND

At this stage of the litigation, I take the below facts directly from the Third Amended Complaint.[1]

---

[1]     When deciding a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court must assume the veracity of all well-pleaded facts found in the complaint. Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009). Thus, I will assume that all the

Plaintiff, an African American and allegedly disabled[2] male, began his employment at SEPTA in June 2008. He was employed by SEPTA for almost ten years in various positions before his termination on July 10, 2018. Most pertinent to the claims before me, in August 2017, Plaintiff was promoted to Assistant Director Backfill of Bus Operations in the Bus Control Department. Plaintiff alleges that during the training for that position, Defendant Marlene Waddell, employed by SEPTA and who Plaintiff describes as African American, "began to subject Plaintiff to severe and pervasive discrimination and harassment in the workplace" on the basis of his race, gender, and disability, continuing "every day until Plaintiff's unlawful termination from employment." Plaintiff claims that Waddell, who also held a "Backfill" position, had supervisory authority over him. (3d Am. Compl., ¶¶ 9, 21–22, 67.)

I will note here that many of the allegations in Plaintiff's 255-paragraph Third Amended Complaint are repetitive and conclusory, but I have discerned the following facts regarding the alleged discriminatory conduct attributed to Waddell:

- When Plaintiff had to communicate with his coworkers, Defendant Waddell banged on her desk, made spitting noises, hummed, and created a noisy environment designed to interfere with Plaintiff's work environment. Waddell engaged in this type of conduct on a daily basis from August 2017 until June 2018. (Id. at ¶¶ 47, 50.)

- Defendant Waddell was physically violent and aggressive toward Plaintiff and spoke to Plaintiff in an abusive, condescending manner aimed at insulting Plaintiff and ridiculing him. (Id. at ¶ 53.)

---

facts found in the Third Amended Complaint are true for purposes of Defendants' Motion to Dismiss.

[2] Plaintiff claims that at all times relevant to this matter, he suffered from a disability as defined by the ADA. Plaintiff alleges that his disability includes "irritable bowel syndrome and other issues affecting Plaintiff's digestive system," including "stomach issues and gas." (3rd Am. Compl., ¶¶ 39–42, 124.) Plaintiff states that as a result of these digestive issues, the following major life activities have been affected: "urinating and bowel movements, sleeping, and eating." (Id. at ¶ 41.)

- During a meeting to discuss Plaintiff's reports of discrimination and harassment against Waddell in October 2017, Waddell informed everyone present that there was "nothing good about Anthony Powers." (Id. at ¶¶ 62, 63.)

- In October 2017, Plaintiff was at his workstation and opened a drawer to retrieve his policy binder. Waddell walked by and kicked the drawer shut. Plaintiff had to pull his hand from the drawer to avoid his hand being crushed when the drawer slammed shut. After kicking the drawer shut, Waddell said, "no drawers open on my floor boy." (Id. at ¶ 66.)

- Throughout Plaintiff's employment with SEPTA, Waddell often used the term "boy" to refer to Plaintiff. Plaintiff asked Waddell not to call him "boy," however, Waddell continued to refer to Plaintiff as "boy" throughout Plaintiff's employment with SEPTA and until Plaintiff's termination. (Id. at ¶¶ 67, 71–72.)

- In October 2017, Plaintiff took a call from an individual asking for Waddell. Plaintiff placed the call on hold and notified Waddell about the call. Defendant Locks overheard the call and also informed Waddell about it. A few minutes later, Waddell yelled across the room, "he has one more time of not giving me my calls and we are going to have a fucking problem." (Id. at ¶ 73.)

- The following day Locks informed Plaintiff that Waddell had lodged complaints related to Plaintiff's conduct at work. Locks stated that Plaintiff and the other employees on the floor had been accused of developing their own system of sign language, designed to undermine Waddell and Defendant Benson. (Id. at ¶¶ 79–83.)

- In November 2017, Waddell threw a pile of papers at Plaintiff as she walked by his desk. (Id. at ¶ 90.)

- In December 2017, Waddell informed the office that Plaintiff's nickname was now "diapers" because Plaintiff is a crybaby and will report discrimination and harassment in the workplace. (Id. at ¶¶ 105–106, 145.)

- Waddell informed Plaintiff's coworkers that Plaintiff did not wash himself. Waddell, who was working approximately fifteen feet away from Plaintiff, packed up her belongings and announced loudly to the room, "it smells like gas over there, he has body odor. He must not wash." Plaintiff was forced to work in a different physical location. Waddell made a point of announcing loudly Plaintiff's decision to move to another seat across the room. These statements exacerbated the symptoms related to Plaintiff's disability. (Id. at ¶¶ 136, 138–139, 141– 142.)

- On April 12, 2018, Waddell physically "bumped Plaintiff out of her way." There were multiple witnesses who saw the incident. After the physical conduct directed at Plaintiff, Waddell began screaming at Plaintiff. Waddell began threatening Plaintiff stating, "if you have a problem with me, come see me." Waddell then ran into Defendant Benson's office and made a false report against Plaintiff. Plaintiff was suspended without pay. (Id. at ¶¶ 147–149, 159.)

In addition to Waddell, Plaintiff claims that Defendant Arthur Locks, SEPTA's Assistant Director of Bus Operations, and Defendant Michaeleen Benson, SEPTA's Director of Bus Operations, "aided and abetted in the disparate treatment of Plaintiff." (Id. at ¶ 160.) Plaintiff asserts the following facts regarding Locks and Benson's alleged discriminatory conduct:

- Defendants Waddell, Locks, and Benson implemented a new overtime system designed to withhold overtime opportunities from Plaintiff. From September 2017 through December 2017, Plaintiff was denied the opportunity to work overtime on multiple occasions due to this policy. (Id. at ¶¶ 28–29.)

- When Plaintiff reported discrimination and harassment in the workplace, Defendants threatened Plaintiff by telling him, "you are bringing unnecessary attention to yourself." Locks made threatening comments of this nature to Plaintiff, stating that Plaintiff's reports "were going to cause [Plaintiff'] problems." (Id. at ¶ 56.)

- Locks responded to Plaintiff's reports of discrimination and harassment in the workplace by warning Plaintiff to "man up." (Id. at ¶ 57.)

- Plaintiff reported the October 2017 drawer-kicking incident with Waddell to Locks and the Deputy Chief of the Control Center. No investigation or disciplinary action was taken to correct the conduct. (Id. at ¶ 68.)

- Locks overheard Waddell's threat to Plaintiff, "he has one more time of not giving me my calls and we are going to have a fucking problem." Plaintiff informed Locks that he was concerned about this threat. Locks took no investigative, disciplinary, or remedial action. (Id. at ¶¶ 74–76.)

- Plaintiff reported the incident where Waddell threw a pile of papers at him to Benson. Benson took no investigative or disciplinary action. (Id. at ¶¶ 91– 92.)

- Benson verbally warned Plaintiff that if she finds out that Plaintiff disclosed schedules to coworkers in advance he would be removed from his position and disciplined further. At no time was there evidence that Plaintiff disclosed schedules to coworkers. (Id. at ¶¶ 100– 102.)

- In February 2018, Benson initiated a policy which relegated Plaintiff to working alone every day. Benson informed all staff that no person was allowed to sit in close proximity to Plaintiff until further notice. (Id. at ¶¶ 121–122.)

- Sometime around October 2017, Plaintiff informed Defendants of his disability. In February 2018, Benson ordered Plaintiff into her office. Benson said to Plaintiff, "it has been brought to my attention that you have a medical problem, and I want to know when

it is going to be resolved." Benson told Plaintiff, "your medical problem is becoming a disturbance to me and other people on the floor." Benson also accused Plaintiff of having a medical problem that was not sanitary. (Id. at ¶¶ 125–126, 128–129, 131.)

- In May 2018, Benson came to Plaintiff's desk and said, "do you know what floor Tommy is on? You should know." Plaintiff had made reports of discrimination and harassment in the workplace to "Tommy." (Id. at ¶ 144.)

- Plaintiff issued Waddell a writeup on January 5, 2018. The write-up was given to Benson. Waddell was neither reprimanded nor disciplined as a result. (Id. at ¶ 146.)

- After Waddell bumped into Plaintiff, Benson ordered Plaintiff to go home. Defendants did not send Waddell home. Plaintiff explained to Benson that Waddell's comment, "come see me," is language that means, "come fight me." Benson responded to Plaintiff, "I don't speak hood, what does that mean?" Plaintiff said, "what do you mean hood? I am not from the hood. However, that is common language that means that someone wants to fight." Benson said, "Marleen probably meant that she wanted to see you to talk in the conference room." (Id. at ¶¶ 150–152, 154–158.)

- Plaintiff saw an opportunity to resolve his issues with the Individual Defendants by moving to another department. Plaintiff applied for and received a transfer. Before his transfer, Benson forced Plaintiff to serve a suspension for an offense he did not commit. Benson then sabotaged Plaintiff's computer system after Plaintiff was transferred to his new position. (Id. at ¶¶ 162–165.)

- Soon after his transfer to the Video Evidence Department on June 6, 2018, Plaintiff, received a text from another SEPTA employee which stated, "[Benson] knows what you did." (Id. at ¶¶ 167–168.)

- On June 7, 2018, the Assistant Director of the Video Evidence Department informed Plaintiff that he needed to report to his old director, Defendant Benson. (Id. at ¶ 169.)

- Plaintiff no longer felt comfortable being in Benson's presence alone and informed Defendant Locks that he did not want to report to Benson without someone else present. Locks suggested that Plaintiff ask a union representative to join him for his meeting with Benson. Plaintiff took that advice. (Id. at ¶¶ 170–172.)

- During Plaintiff's June 7, 2018 meeting with Benson, Benson claimed that she found a message on Plaintiff's old computer that was scheduled to be sent on July 10, 2018. The alleged message stated, "all operators call control center." Plaintiff denies creating this message. (Id. at ¶¶ 173–174, 178.).

- On June 11, 2018, Plaintiff was informed that Benson already had Plaintiff's termination paperwork typed up and that Benson was pushing hard for his termination. (Id. at ¶ 175.)

- During the grievance process, Plaintiff requested information that would prove that he was innocent and that Plaintiff's termination was pretext. Benson understood what Plaintiff was requesting and did not provide it. Benson executed a strategy designed to achieve Plaintiff's termination with the assistance of Defendant Waddell. (Id. at ¶¶ 181–182.)[3]

Plaintiff also alleges that SEPTA was informed of the Individual Defendants' allegedly harassing and discriminatory conduct and took no remedial action against those individuals. Because of SEPTA's alleged failure to discipline this conduct, Plaintiff claims that he was constructively demoted (what he refers to as a "self-imposed demotion") from his "Backfill Supervisor" position. (Id. at ¶¶ 30, 218.)

In addition, Plaintiff alleges that he received "verbal warnings for lateness," which would result in subtractions of his time, even though similarly-situated employees like Defendant Waddell allegedly arrived late multiple times per week and their time was never "docked." Plaintiff does not identify who verbally warned him for his lateness. He was also allegedly "verbally disciplined" for using his cell phone during work while other "similarly situated employees" were permitted to use their cell phones. Again, Plaintiff does not identify who verbally disciplined him. (Id. at ¶¶ 34–37, 93.)

Finally, Plaintiff claims that he was not allowed to take off on Christmas Day in 2017, despite following proper procedure for requesting time off. Plaintiff asserts that it was later discovered that he should have had the day off, but it was too late. He claims that Defendant Waddell did not request time off at Christmas but "was given off in order to deny Plaintiff . . . the

---

[3]    In Paragraph 143 of the Third Amended Complaint, Plaintiff lists other alleged comments made to him by Defendants. Many of the comments listed in this Paragraph are not alleged elsewhere in the Third Amended Complaint, and Plaintiff does not identify which Defendant made them and does not describe the circumstances under which these comments were made. Those comments include: "That boy over there is stressing me out"; "Whatever boy"; "OK boy"; "You just a child"; "You don't belong here"; "Crybaby"; "You are the man in the situation, just man up"; "When I tell you to do something, I expect you to do it"; "You are ruining my career by reporting me to EEO"; "I can't stand people like you."

time he requested." (Id. at ¶¶ 96–98.) Plaintiff alleges that Defendants did not treat similarly situated "white, Caucasian workers, female coworkers, or non-disabled coworkers in the discriminatory manner to which Plaintiff was subjected and . . . similarly situated coworkers were never denied time off when requests were already approved." (Id. at ¶ 99.)

## II.   PROCEDURAL BACKGROUND

In October 2018, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), the Pennsylvania Human Relations Commission, and the Philadelphia Commission on Human Relations based on the alleged discriminatory conduct described above. On July 11, 2019, the EEOC issued a Dismissal and Notice of Rights to Plaintiff.

Plaintiff filed the original Complaint on October 8, 2019. He has amended the Complaint three times: on January 7, 2020, on October 16, 2020, and on November 2, 2020.[4] In the Third Amended Complaint, Plaintiff brings the following eight claims against Defendants: disparate treatment, hostile work environment, and retaliation on the basis of race against the Individual Defendants pursuant to 42 U.S.C. § 1981 ("**Count I**"); disparate treatment and hostile work environment on the basis of race and gender against SEPTA pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII") ("**Count II**"); retaliation against SEPTA pursuant to Title VII ("**Count III**"); disability discrimination, including a failure to accommodate, against SEPTA pursuant to the Americans with Disabilities Act ("ADA") ("**Count IV**"); retaliation against SEPTA pursuant to the ADA ("**Count V**"); disparate treatment and hostile work environment on the basis of race, gender, and disability against SEPTA pursuant to the Pennsylvania Human

---

[4]   At the time the original Complaint was filed, this matter was before the Honorable John R. Padova. On March 3, 2020, the case was reassigned to the Honorable Karen S. Marston, and, on August 7, 2020, it was reassigned to me. Since that time, I have granted Plaintiff leave to file both a Second Amended Complaint and a Third Amended Complaint.

Relations Act ("PHRA") ("**Count VI**"); retaliation against all Defendants pursuant to the PHRA ("**Count VII**"); and race, gender, and disability against the Individual Defendants pursuant to the PHRA ("**Count VIII**").

Before me is Defendants' Partial Motion to Dismiss the Third Amended Complaint and Defendants' Motion to Strike Plaintiff's Demand for Punitive Damages against the Individual Defendants.

## III.  LEGAL STANDARD

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  The plausibility standard requires more than a "sheer possibility that a defendant has acted unlawfully." Id.  Conclusory allegations do not suffice. Id. To determine the sufficiency of a complaint under Twombly and Iqbal, a court must (1) "tak[e] note of the elements a plaintiff must plead to state a claim"; (2) identify the allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth"; and (3) "where there are well-pleaded factual allegations, . . . assume their veracity and then determine whether they plausibly give rise to an entitlement for relief." Burtch v. Milberg Factors, Inc., 662 F.3d 212, 221 (3d Cir. 2011) (internal quotation marks omitted).  Courts must construe the allegations in a complaint "in the light most favorable to the plaintiff." Id. at 220.  When deciding a motion to dismiss, "'courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint and matters of public record.'" Schmidt v. Skolas, 770 F.3d

241, 249 (3d Cir. 2014) (quoting <u>Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.</u>, 998 F.2d 1192, 1196 (3d Cir. 1993)).

A court may strike from a pleading "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter" pursuant to Federal Rule of Civil Procedure 12(f). A motion to strike may also be granted with regard to a demand for punitive damages if such damages are not available by law or the plaintiff has failed to plead a sufficient factual basis for such damages. <u>See</u> <u>Hills v. Borough of Colwyn</u>, 978 F. Supp. 2d 469, 483–84 (E.D. Pa. 2013).

## IV. <u>ANALYSIS</u>

### A. Hostile Work Environment Claims

Defendants first move to dismiss Counts I, II, IV, V, VI, and VIII to the extent those claims are based on a hostile work environment. Defendants argue that Plaintiff has failed to plausibly plead the elements of his hostile work environment claims because (1) "[t]he vast majority of Plaintiff's allegations involve isolated incidents that do not implicate a protected category" and (2) "[t]he few incidents that are arguably based upon a protected trait are not 'severe or pervasive' enough to give rise to any [hostile work environment] claims." (Defs.' Br. at 11, 14.)

The Supreme Court of the United States has explained that "[w]orkplace conduct is not measured in isolation," so when a workplace "is permeated with discriminatory intimidation, ridicule, and insult[ ] that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 116 (2002) (quoting <u>Clark Cty. Sch. Dist. v. Breeden</u>, 532 U.S. 268, 270 (2001), and <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993)). To state a *prima facie* case for a hostile work environment claim, a plaintiff must prove that (1) he suffered intentional discrimination because of his protected activity; (2) the discrimination was severe or

pervasive; (3) the discrimination detrimentally affected him; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present. Jensen v. Potter, 434 F.3d 444, 449 (3d Cir. 2006), overruled on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53 (2006)).  In other words, a "severe or pervasive" hostile work environment is substituted in place of a materially adverse employment action.  See Hare v. Potter, 220 F. App'x 120, 131–32 (3d Cir. 2007); Komis v. Perez, No. 11-6393, 2014 WL 3437658, at *2 (E.D. Pa. July 15, 2014).

"The inquiry into whether the discriminatory or retaliatory environment was 'severe or pervasive' recognizes that less severe isolated incidents which would not themselves rise to the level of retaliation may, when taken together as part of 'the overall scenario,' evidence retaliatory animus, and one severe incident may be enough to create a hostile work environment." Komis, 2014 WL 3437658, at *2 (quoting Jensen, 435 F.2d at 450).  "The 'severe and pervasive' element requires [a plaintiff] to show that her work environment became so abusive because of the discriminatory actions by her supervisors and co-workers that it changed the very nature of her employment." Id.  "To judge whether such an environment is hostile or abusive, [a court] must consider all the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" Walton v. Mental Health Ass'n of Se. Pa., 168 F.3d 661, 667 (3d Cir. 1999) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993)).

Where the hostile work environment is perpetrated by co-workers rather than supervisors, the United States Court of Appeals for the Third Circuit has made clear that "[a]n employer may be liable under Title VII for retaliatory harassment only if the *prima facie* case is satisfied and if

there is a basis for employer liability for the co-worker's conduct." Moore v. City of Phila., 461 F.3d 331, 349 (3d Cir. 2006). "There is such a basis for liability where supervisors 'knew or should have known about the [co-worker] harassment, but failed to take prompt and adequate remedial action' to stop the abuse." Id. (quotation omitted).

Defendants first argue that many of the allegations in the Third Amended Complaint involve isolated incidents that do not implicate a protected category. I agree. Most of the alleged conduct that Plaintiff attributes to the Individual Defendants and SEPTA do not implicate his race, gender, or disability. In order to plead a *prima facie* case of hostile work environment, Plaintiff must plausibly allege that he was subject to intentional discrimination because of his race, gender, or disability and that the discrimination was severe or pervasive. Much of the alleged behavior that Plaintiff attributes to Defendants, particularly Defendant Waddell, is certainly unprofessional and offensive but does not plausibly allege discriminatory intent or severe or pervasive discrimination. For instance, Plaintiff's allegations that Defendant Waddell frequently made loud noises when he was trying to speak to co-workers, threw papers on him, and made physical contact by bumping into him, although inappropriate workplace behavior, does not plausibly plead discrimination or a hostile work environment based on a protected category.

Moreover, because Defendant Waddell and Plaintiff are both African American, without more, the Third Amended Complaint does not plausibly support that Waddell's conduct in these instances, as a member of the same protected class, was motivated by Plaintiff's race. See Currie v. Arthur, No. 11-892, 2012 WL 1715390, at *4 (E.D. Va. May 15, 2012) ("Even taking the facts of this case in the light most favorable to the Plaintiff, it is unlikely that any jury would find that a watermelon left by one African-American on the desk of another African-American was racially

motivated. . . . This is especially true when there is no objective evidence in the record that. . . the watermelon [was left] as a symbol of racial hostility.").

### 1. Alleged Comments Based on Race

Defendants acknowledge that some of the conduct alleged in the Third Amended Complaint could "arguably" be based on race. They deny, however, that Defendants' alleged conduct was severe or pervasive enough to give rise to a hostile work environment claim.

One such category of conduct alleged by Plaintiff to be racially discriminatory is Defendant Waddell's use of the word "boy" to refer to Plaintiff. In one instance, Waddell allegedly slammed Plaintiff's desk drawer, stating "No drawers open on my floor boy." (3d Am. Compl., ¶ 66.) Plaintiff asserts that this comment is "indicative of slavery times when slaves were called 'boy' on plantations" and "where black African American slaves would treat other black African Americans with ridicule and contempt." (Id. at ¶ 67.) Plaintiff claims that Waddell repeatedly referred to him as "boy," even after he asked her to stop. Another such race-related incident involved Defendant Benson, who asked Plaintiff to translate Waddell's statement, "come see me," because, according to Benson, she did not speak "hood." (Id. at ¶ 155.)

I agree with Defendant that Plaintiff has not sufficiently pled that Waddell's use of the term "boy" and Benson's reference to Waddell speaking "hood," plausibly supports a pattern of severe or pervasive discrimination that was so abusive it changed the very nature of Plaintiff's employment. See Komis, 2014 WL 3437658, at *2; Huggins v. Coatesville Area Sch. Dist., Nos. 07-4917, 09-1309, 2010 WL 4273317, at *6 (E.D. Pa. Oct. 29, 2010) (finding that an "alleged pejorative 'boy' remark to [the plaintiff] falls into the category of isolated and offhand comments, and although inappropriate, cannot be considered to have altered the terms and conditions of [the plaintiff's] employment").

In fact, courts have found that in certain situations, the use of more explicit racial slurs, such as the "n-word," does not create a hostile work environment. In <u>Woodard v. PHB Die Casting</u>, 255 F. App'x 608 (3d Cir. 2007), the plaintiff alleged that, over the course of five years, he heard second-hand about several allegedly racist comments by co-workers and that he was given less favorable job assignments. <u>Id.</u> at 608–09. The plaintiff further alleged that: (a) he saw a burning cross and KKK sign on a bathroom wall, and that management failed to have it removed for at least three months after he reported it; (b) he was told by co-workers about blatantly racist comments made by other co-workers; and (c) more ambiguous racially-charged comments were directed to him by co-workers. <u>Id.</u> at 609. The Third Circuit noted that while the KKK-related graffiti and the employer's failure to remove it promptly were serious, "this one incident, even in conjunction with the other comments, was not enough for a trier of fact to conclude that discriminatory conduct in the workplace amounted to a change in the terms or conditions of [the plaintiff's] employment." <u>Id.</u> at 610.

Likewise, in <u>Larochelle v. Wilmac Corp.</u>, 210 F. Supp. 3d 658 (E.D. Pa. 2016), the plaintiff's supervisor told plaintiff that he was going to request that she work on his wing because she did not talk "'ghetto' like every other Ni\*\*er there" and she was "going to be Rehab's House Ni\*\*er." <u>Id.</u> at 670. When the plaintiff reported the statements to a superior, he told her the supervisor was "just joking and that Plaintiff shouldn't take it so seriously." <u>Id.</u> The court concluded that "[w]here no serious or severe incidents occur, an individual cannot rely upon casual, isolated or sporadic incidents to advance a hostile work environment claim," even where "the acts of harassment alleged are verbal utterances or racial epithets." <u>Id.</u> at 695. Although the court deemed the alleged remarks troubling, it noted that the plaintiff could not specifically identify

any other incidents of continued racial harassment. Absent a clear pattern or incident of harassment, the court dismissed the claim. Id.

Finally, in Reed v. Procter & Gamble Mfg. Co., 556 F. App'x 421 (6th Cir. 2014), the plaintiff, an African American man, had testified that he was sitting at his desk when his supervisor walked in, took a telephone cord out of a drawer, and then stood behind the plaintiff. Id. at 425. The plaintiff then heard another co-worker laugh and asked the supervisor, "Are you fixing to hang someone?" after the supervisor made a noose with the cord. Id. The plaintiff also overheard a white co-worker comment to another white employee about eating "watermelon and fried chicken." Id. at 433. The Sixth Circuit found that the combined effect of these incidents was not sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment. Id. at 433–34. While it remarked that the telephone cord incident was "much more troubling," it found that it was "isolated" and that the employee "did not directly accost or threaten" the plaintiff. Id. at 433.

Here, I first note that Defendant Benson's comment to Plaintiff about Waddell speaking "hood," although related to Plaintiff's race, is an isolated incident upon which Plaintiff cannot rely to advance a hostile work environment claim. See Larochelle, 210 F. Supp. 3d at 695. Regarding Defendant Waddell's use of the term "boy," although Plaintiff alleges that this conduct occurred "often" and continued throughout his employment, he fails to precisely allege the frequency at which Waddell referred to him as "boy." (See 3d Am. Compl., ¶¶ 71–72.) In fact, Plaintiff alleges only one specific incident involving Waddell's use of that term. (See id. at ¶ 66.) These allegations are not sufficient, at this stage, to support a pattern of discrimination so pervasive that it altered the terms or conditions of Plaintiff's employment. See Feeney v. Jeffries, No. 09-2708, 2010 WL 2629065, at *5 (D.N.J. June 28, 2010) (finding that the plaintiff's claim that his supervisor

"repeatedly" made derogatory comments but alleged only two occasions when such comments were made was insufficient to withstand a motion to dismiss his hostile work environment claim).

Waddell's use of the term "boy" is also not severe enough to plausibly support a hostile work environment claim. As set forth above, the courts in <u>Woodard</u>, <u>Larochelle</u>, and <u>Reed</u> considered and rejected incidents and verbal utterances that were much more racially explicit than those before me. Although, in each instance, these courts acknowledged the serious nature of the racially-motivated conduct at issue, that conduct, like the conduct before me, was ultimately insufficient to support a hostile work environment claim based on race. Thus, based on this precedent and for the foregoing reasons, I will dismiss Counts I, II, VI, and VIII to the extent they claim a race-based hostile work environment.[5]

## 2. Alleged Comments Based on Disability

Defendants also acknowledge that Plaintiff alleges conduct perpetrated by Defendants Benson and Waddell that arguably implicates Plaintiff's disability. Specifically, Plaintiff claims that Defendant Benson interrogated him about his disability after he disclosed it, telling him that his medical condition was disturbing her and other employees working near Plaintiff and that it was unsanitary. Benson also allegedly made Plaintiff work alone and informed all staff that no

---

[5] Defendants' arguments in support of my dismissing Counts II, VI, and VIII are focused solely on a hostile work environment theory, but the Third Amended Complaint makes clear that these Counts are also based on a theory of disparate treatment. Defendants appear to acknowledge that certain comments alleged in the Third Amended Complaint are based on race, which I find that Plaintiff has plausibly pled. But, other than challenging the severe and pervasive nature of these alleged comments, Defendants do not attack the Third Amended Complaint based on the elements of a disparate treatment claim—(1) that Plaintiff belongs to a protected class; (2) he was qualified for the position he sought to retain; (3) he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination. <u>Makky v. Chertoff</u>, 541 F.3d 205, 214 (3d Cir. 2008). Thus, these Counts will survive dismissal to the extent they raise claims of disparate treatment based on race.

one was allowed to work in close proximity to Plaintiff. Plaintiff also claims that Defendant Waddell moved to another work area, announcing to other employees on the floor that it smelled like gas, Plaintiff had body odor, and Plaintiff did not wash himself.[6]

Defendants first contend that Plaintiff's hostile work environment claim must be dismissed because he has failed to sufficiently plead that he suffers from a disability under the ADA. I disagree. In order for Plaintiff to plausibly plead that he is disabled under the ADA, he must allege that he suffers from "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A). "A major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. § 12102(2)(B). Plaintiff claims that he suffers from irritable bowel syndrome and other gastric and digestive issues which allegedly affect his urinating and bowel movements, sleeping, and eating. At this stage, viewing the facts in the light most favorable to Plaintiff, I find that he has plausibly pled that he suffers from a disability under the ADA.[7]

---

[6]     Plaintiff also alleges that Defendants Benson and Waddell referred to him as "diapers," but he explicitly alleges in the Third Amended Complaint that this comment was because Waddell and Benson thought Plaintiff was a "crybaby" for reporting discrimination in the workplace. Plaintiff does not allege that this comment was related to his disability.

[7]     To the extent that Plaintiff seeks to bring an ADA failure to accommodate claim, I find that Plaintiff has failed to plausibly plead such a claim. Specifically, Plaintiff fails to allege facts to support three of the four elements of a failure to accommodate claim, including that "he requested an accommodation or assistance," "his employer did not make a good faith effort to assist," and "he could have been reasonably accommodated." Dreibelbis v. Cnty. of Berks, 438 F. Supp. 3d 304, 316 (E.D. Pa. 2020). Thus, any such claim will be dismissed against all Defendants.

Defendants also argue that the alleged conduct of Waddell and Benson regarding Plaintiff's disability is not severe and pervasive enough to support a hostile work environment claim. I agree. These few, isolated incidents in which Waddell and Benson made offensive comments or acted offensively toward Plaintiff, while embarrassing and unprofessional, do not plausibly plead a pattern of severe discrimination so abusive that the very nature of Plaintiff's employment was altered. Counts IV, V, VI, and VIII are, therefore, dismissed to the extent they claim a disability-based hostile work environment.[8]

### 3. Alleged Comments Based on Gender

Finally, concerning Plaintiff's claims of disparate treatment, hostile work environment, and retaliation based on gender, Plaintiff alleges that on one occasion, Defendant Locks told him to "man up." (3d Am. Compl., ¶ 57.) He also claims that "Defendants" (Plaintiff does not identify which Defendant) made a comment, "You are the man in the situation, just man up." (Id. at ¶ 143.) Plaintiff provides no context regarding this alleged comment. These two isolated, offhand comments are insufficient to support a hostile work environment claim. In addition, because both Locks and Plaintiff are male, without more, Plaintiff has failed to plausibly plead that Locks's use of the colloquialism, "man up," some unknown period of time before Plaintiff's termination, is motivated by Plaintiff's gender or otherwise supports that Plaintiff was either terminated based on his gender or retaliated against for raising gender-based discrimination. Thus, all claims based on Plaintiff's gender are dismissed.

---

[8]     Similar to Defendants' arguments regarding Plaintiff's race-based hostile work environment claims, Defendants do not attack the Third Amended Complaint based on any other elements of a disability disparate treatment claim or disability retaliation claim, except to argue that Plaintiff does not suffer from a disability under the ADA. Because I find that Plaintiff has plausibly pled a disability under the ADA, Counts IV, V, VI, and VIII will survive dismissal to the extent they raise claims of disparate treatment and retaliation based on disability.

### B. Claims Against Individual Defendants

Defendants also move to dismiss Counts I, VII, and VIII against the Individual Defendants, arguing that (1) Defendant Waddell cannot be held personally liable under the PHRA because she was subordinate to Plaintiff; (2) Defendants Benson and Locks cannot be held personally liable under the PHRA because there is no allegation to suggest they shared a motive with SEPTA to discriminate or retaliate against Plaintiff; and (3) Defendants Waddell, Benson, and Locks cannot be held personally liable under § 1981 because they did not behave differently toward Plaintiff because he engaged in allegedly protected activity.

### 1. PHRA Claims

First, I address whether Defendants Waddell, Benson, and Locks can be held personally liable under the PHRA. Pursuant to the PHRA, it is unlawful "[f]or any person, employer, employment agency, labor organization, or employee, to aid, abet, incite, compel or coerce that doing of any act declared by this section to be an unlawful discriminatory practice." 43 Pa. Stat. § 955(e). Other members of this Court have determined that the aiding and abetting provision of the PHRA applies only to supervisory employees because "non-supervisory employees cannot be liable for aiding and abetting their employer's discrimination through direct discriminatory acts because they do not share the intent and purpose of their employer." See, e.g., Santai v. Fred Beans Ford, Inc., No. 10-2367, 2011 WL 3606836, at *3 (E.D. Pa. Aug. 16, 2011) (citing Dici v. Pennsylvania, 91 F.3d 542, 552–53 (3d Cir. 1996)); see also Hewitt v. BS Transportation of Illinois, LLC, 355 F. Supp. 3d 227, 237–38 (E.D. Pa. 2019) ("Courts have limited individual liability under § 955(e) to 'supervisory employees.'"); Destefano v. Henry Michell Co., No. 99-5501, 2000 WL 433993, at *2 (E.D. Pa. Apr. 13, 2000) (reasoning that only "supervisory employees can share the discriminatory intent and purpose of the employer").

In other words, the PHRA permits suits against supervisory employees, "provided that they share the discriminatory intent and purpose of the employer." Pinder v. Ortiz, No. 14-2989, 2015 WL 317043, at *2 (E.D. Pa. Jan. 26, 2015). "Requiring proof of intent to aid the employer under section 955(e) is consistent with the principles of aiding and abetting liability found in other areas of Pennsylvania law." Id. (quoting Destefano, 2000 WL 433993, at *2.) Individual supervisory employees can be found to share the intent and purpose of their employer and therefore can be found liable under § 955(e) for their "own direct acts of discrimination," including their termination of an employee for an unlawful reason, or their "failure to take action to prevent further discrimination by an employee under supervision." Hewitt, 355 F. Supp. 3d at 238 (internal quotation marks omitted); Santai, 2011 WL 3606836, at *3 (collecting cases).

Regarding Defendant Waddell, Plaintiff alleges in a conclusory fashion that she had supervisory authority over him. He claims that Waddell had the authority to "take a tangible employment action against him," the authority to discipline Plaintiff "including issue writeups," the authority to reassign Plaintiff and "force Plaintiff to have different duties," and the authority to extend or deny overtime to Plaintiff. (3d Am. Compl., ¶ 9.) Yet, Plaintiff pleads no facts to support these allegations. Although not clearly stated in the Third Amended Complaint, Plaintiff appears to assert that Waddell held a position in "Backfill," which Plaintiff claims is supervisory and has "the same authority as an Assistant Director to take tangible employment actions." (Id. ("Any employee for SEPTA who holds a supervisory position such as 'Backfill' has the same authority as an Assistant Director and has the same ability to take tangible employment actions against employees like Plaintiff, Anthony Powers.").) Plaintiff does not allege what position Waddell held. Plaintiff asserts that in August 2017, he was promoted to Assistant Director Backfill

of Bus Operations. This promotion pre-dates all of Waddell's alleged discriminatory and harassing conduct described in the Third Amended Complaint.

Even reading the allegations in the light most favorable to Plaintiff, based on his own admission, it appears that Plaintiff and Waddell were both supervisors in "Backfill" and possessed the same supervisory authority over other employees. (Id.) At best, this would make Plaintiff and Waddell peers or co-workers. In fact, Plaintiff alleges that on January 5, 2018, he "issued Defendant[] Marleen Waddell a writeup," which he gave to Defendant Benson, but Waddell was allegedly never disciplined. (Id. at ¶ 146.) This allegation seems to imply that it was Plaintiff who had supervisory authority over Waddell, not Waddell over Plaintiff.

Moreover, Plaintiff claims that on June 6, 2018, he was transferred to "another department," the Video Evidence Department. (Id. at ¶ 162.) Plaintiff alleges that Mike Kirwin, the Assistant Director of the Video Evidence Department, who was meant to act as Plaintiff's supervisor in this new department, told him that he was required to report to his "old director (Defendant, Michaeleen Benson)." (Id. at ¶¶ 167–169.) Plaintiff does not allege that he was required in this new position to report to Waddell. Based on the allegations in the Third Amended Complaint, I conclude that Plaintiff has failed to plausibly plead that Defendant Waddell was his supervisor or had supervisory authority over him. Thus, all PHRA claims brought against Waddell will be dismissed.

Regarding Defendant Benson, Plaintiff alleges that she was the Director of Bus Operations at the time he held the position of Assistant Director Backfill of Bus Operations and that he was asked to report to her even after he had been transferred to the Video Evidence Department. Plaintiff also asserts that he was disciplined by Benson, including being "forced" to "serve a suspension" before transferring to the Video Evidence Department. (Id. at ¶ 164.) Finally,

Plaintiff pleads that Benson was responsible for preparing his termination paperwork. Based on these alleged facts, I find that Plaintiff has adequately pled that Benson held supervisory authority over him.

Yet, for Plaintiff's claims against Benson to survive dismissal, he must plausibly plead that Benson shared in the alleged discriminatory intent and purpose of Defendant SEPTA. Plaintiff can satisfy this requirement under § 955(e) by alleging that Benson committed direct acts of discrimination against him or failed to take action to prevent further discrimination by an employee under supervision. See Hewitt, 355 F. Supp. 3d at 238. Defendants argue that "there are no allegations in the Third Amended Complaint that suggest a shared motive or scheme between [Benson] and SEPTA as the PHRA requires." (Defs.' Br. at 22.) But Defendants ignore Benson's direct alleged comment about speaking "hood" to Plaintiff when asking Plaintiff, an African American employee, to translate the statement of Waddell, another African American employee, "come see me." (3d Am. Compl., ¶¶ 154–55.) As discussed above, Defendants do not argue that Plaintiff's race-based disparate treatment claim based on this comment is insufficiently pled. Instead, they argue only that Plaintiff cannot plead a severe and pervasive pattern of discrimination to support a hostile work environment claim based on this comment.

Defendants also disregard Benson's direct alleged comments to Plaintiff regarding his disability. Plaintiff claims that after he informed Defendants of his alleged disability, Benson asked him when it would be resolved because it was "becoming a disturbance to [Benson] and other people on the floor." (Id. at ¶¶ 128–29.) Benson also allegedly told Plaintiff that his medical condition was "not sanitary" and initiated a policy that required Plaintiff to work alone every day and prohibited all staff from sitting near Plaintiff. (Id. at ¶¶ 121, 131.) Finally, Plaintiff asserts that Benson was the one who prepared his termination paperwork prior to any "meaningful

investigation" and was "pushing hard" for his termination. (Id. at ¶¶ 175–76.) Based on these allegations, I find that Plaintiff has sufficiently pled at this stage that Benson shared a discriminatory intent and purpose with SEPTA. Therefore, I will deny Defendants' motion to dismiss Plaintiff's PHRA claims against her.

Like Defendant Benson, I find that Plaintiff has plausibly pled that Defendant Locks, who Plaintiff identifies as the Assistant Director of Bus Operations, had supervisory authority over Plaintiff while he held the position of Assistant Director Backfill of Bus Operations. Based on the Third Amended Complaint, Plaintiff most often reported Defendants' alleged discriminatory and harassing conduct to Locks. Plaintiff also claims that after reporting this alleged conduct to Locks, he took no remedial action. Thus, because Plaintiff has sufficiently alleged, at this stage, that Locks failed to act to prevent further discrimination against Plaintiff, specifically by Waddell, I will deny Defendants' motion to dismiss the PHRA claims against him.

### 2. Section 1981 Claim

Defendants also argue that Waddell, Benson, and Locks cannot be held personally liable under § 1981 because they did not behave differently toward Plaintiff based on his allegedly protected activity. An individual may be held liable under § 1981 "when [that individual] intentionally cause[s] an infringement of rights protected by Section 1981, regardless of whether the [employer] may also be held liable." Cardenas v. Massey, 269 F.3d 251, 268 (3d Cir. 2001) (quoting Al-Khazraji v. Saint Francis College, 784 F.2d 505, 518 (3d Cir. 1986)). That is, "a claim seeking to impose personal liability under Section 1981 must be predicated on the actor's personal involvement and there must therefore be some affirmative link to causally connect the actor with the discriminatory action." Kohn v. Lemmon Co., No. 97-3675, 1998 WL 67540, at *5 (E.D. Pa. Feb. 18, 1998) (quoting Allen v. Denver Pub. Sch. Bd., 928 F.2d 978, 983 (10th Cir. 1991)).

"[I]ndividuals are personally involved in the discrimination . . . if they authorized, directed, or participated in the alleged discriminatory conduct." Al-Khazraji, 784 F.2d 518.

I note first that Defendants' arguments appear to be based solely on retaliation, i.e., that Waddell, Benson, and Locks did not behave differently toward Plaintiff after he engaged in allegedly protected conduct. Defendants do not seem to address the disparate treatment aspect of Plaintiff's § 1981 claim. As already discussed, Waddell and Benson both made race-based comments toward Plaintiff. Thus, I find that Plaintiff has adequately pled, at this stage, Waddell and Benson's "personal involvement" in the alleged discrimination against him by their direct participation in it. See Al-Khazraji, 784 F.2d 518.

Regarding Plaintiff's claims of retaliatory harassment based on race against Waddell and Benson, Plaintiff alleges that Waddell's race-based comments, specifically her repeated use of the term "boy," continued until his termination in July 2018, after he had reported Waddell's conduct multiple times to Defendants and received the letter from SEPTA's internal Equal Employment Opportunity ("EEO") division in November 2017. (See 3d Am. Compl., ¶¶ 71–72, 103.) Regarding Benson, her comment to Plaintiff about speaking "hood" occurred in April 2018, after Plaintiff had made multiple reports of discriminatory conduct and filed a complaint with SEPTA's EEO division in November 2017. (Id. at ¶¶ 103, 147, 154–56.) For these reasons, I will deny Defendants' motion to dismiss Plaintiff's § 1981 claims against Waddell and Benson.

Finally, I do not find that Plaintiff has plausibly pled his § 1981 claim against Defendant Locks. Plaintiff does not allege that Locks affirmatively authorized, directed, or personally participated in any alleged racially discriminatory conduct, only that Plaintiff reported alleged discriminatory conduct to Locks and he failed to take remedial action. Thus, Defendants' motion will be granted as to Defendant Locks.

### C. Punitive Damages Against Individual Defendants

Lastly, Defendants move to strike Plaintiff's demand of punitive damages against Defendant SEPTA and the Individual Defendants because Plaintiff has failed to allege the requisite motive or reckless indifference required to support an award of punitive damages.[9]  Plaintiff may recover punitive damages for intentional discrimination if he demonstrates that Defendants "engaged in discriminatory practices with malice or with reckless indifference to federally protected rights." Donlin v. Philips Lighting N. America Corp., 581 F.3d 73, 79 n.2 (3d Cir. 2009). Apart from conclusory allegations that Defendants acted outrageously or with malice, Plaintiff pleads no facts to support his punitive damages claim.  Thus, such requested relief will be stricken from the Third Amended Complaint.

## V. __CONCLUSION__

For the foregoing reasons, Defendants' Partial Motion to Dismiss and Motion to Strike is granted in part and denied in part.

An appropriate Order follows.

---

[9]     Punitive damages are not available under the PHRA.  Hoy v. Angelone, 720 A.2d 745, 749–50 (Pa. 1998).  Thus, Plaintiff's request for punitive damages under the PHRA is stricken.