**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ANTHONY POWERS,** | |
| *Plaintiff,* | **Civil Action** |
| *v.* | **No. 19-cv-4685** |
| **SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY** *et al.*, | |
| *Defendants.* | |

**<u>MEMORANDUM OPINION</u>**

**GOLDBERG, J.**                                                  **May 18, 2023**

Plaintiff Anthony Powers ("Powers") has sued the South Eastern Pennsylvania Transportation Authority (SEPTA) under 42 U.S.C. § 1981, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e <u>et seq.</u>, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 <u>et seq.</u>, and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Stat. ch. 17. Powers brings discrimination claims based on race, gender, and disability, as well as retaliation for opposing these practices, while he was an employee with SEPTA. Powers has also sued various individual employees of SEPTA. All Defendants have moved for summary judgment on all claims.

For the reasons that follow, a majority of Defendants' motion will be granted, while some claims will survive.

**I.      <u>FACTS</u>**

The following facts are presented in the light most favorable to Powers as the party opposing summary judgment. (I note that a large portion of these facts come from a 160-paragraph

"declaration" that was produced after Powers was deposed.) Where the facts are materially disputed, those disputes are indicated.

### A.    Anthony Powers

Plaintiff Anthony Powers is a black, African American male who worked for SEPTA from June 2008 until his termination in June 2018. (Powers Dec. ¶¶ 1-2, 6.) Powers has an undiagnosed stomach condition that requires him to use the bathroom frequently. (Powers Dep. 128, 345-47.) According to Powers, the condition "significantly interferes with and substantially limits [his] ability to eat." (Powers Dec. ¶ 160.)

### B.    SEPTA's Bus Control Center

From October 2014 until his termination, Powers worked in SEPTA's Bus Control Center as a Bus Control Center Manager. (Powers Dec. ¶¶ 4-6.)

#### 1.    Management Structure

There were multiple levels of management in the Bus Control Center. A "Director" supervised a staff of "Assistant Directors" and "Managers"—the latter group including Powers. Defendant Michaeleen Benson held the position of Director from 2015 through the remainder of Powers's employment with SEPTA. Benson was supervised by a Deputy Chief, Aleta Washington (who was not named as a defendant). (Locks Dep. 11.) Defendant Arthur Locks was one of the Assistant Directors during this time. (Defendants' Facts ¶ 3.)

#### 2.    Backfill Duties

Bus Control Center Managers like Powers who had completed "backfill training" were allowed to act as temporary Assistant Directors on an as-needed basis. (Defendants' Facts ¶¶ 8, 11; Powers Dec. ¶ 11.) In or around July 2017, Powers began working as a backfill employee. (Powers Dec. ¶ 15.)

### C.     Powers's Interactions with Marlene Waddell

Powers's interactions with Defendant Marlene Waddell, a fellow Bus Control Center Manager, underlie much of the present lawsuit. When Powers started in the Bus Control Center in November 2014, Waddell was already working there as a Bus Control Center Manager, a position she held throughout the remainder of Powers's employment with SEPTA. (Defendants' Facts ¶ 10; Powers Dec. ¶ 19.)

#### 1.     Waddell's Backfill Duties

Waddell began backfill training around the same time Powers joined the Bus Control Center. (Powers Dec. ¶ 18.) Powers understood Waddell to be his direct supervisor when she was working as a Backfill. (Powers Dec. ¶ 20.) As such, Powers stated that during these times, Waddell "had the authority to subject [him] to discipline, send [him] home, allow [him] to work overtime, allow [him] to work move-ups, make [his] shift longer, [and] make [his] shift shorter." (Powers Dec. ¶ 21.)

#### 2.     Growing Hostility in the Summer of 2017

Powers and Waddell were "cordial with one another" when Powers began working in the Bus Control Center in 2014 (Defendants' Facts ¶ 14; Powers Dep. 145:15.) But their interpersonal relations changed once Powers began backfill training in or around the summer of 2017. (Powers Dec. ¶ 40.) It was also around this time that Powers began reporting "harassment and abuse in the conduct and comments of Marlene Waddell" to Benson, as described in greater detail below. (Powers Dec. ¶ 40.)[1]

---

[1] Defendants characterize Powers's interaction with Waddell as a "feud." Powers objects to this term, although he did not entirely disagree with it in his deposition testimony. (See Powers Dep. 224 ("I was disqualified [from the backfill rotation], but it wasn't due to an ongoing feud with Ms. Waddell, It was due to the ongoing harassment, discrimination I received from Ms. Waddell."); Id. at 341 ("Yes, the feud was between me and her.").)

3.      Nickname "Boy"

Powers took particular offense to Waddell calling him "boy," which Waddell did frequently. (Powers Dep. 146; Powers Dec. ¶ 125.) For example, Waddell would say things such as, "[t]hat boy over there is stressing me out," "[w]hatever boy," and "OK boy." (Powers Dec. ¶ 125) Powers describes an incident in which Waddell kicked Powers's desk drawer closed and referred to him as "boy" in the process. (Powers Dep. 287-88.) According to Powers, "[w]hen an adult black man is repeatedly referred to as 'boy' in an aggressive and violent manner, it is racist." (Powers Dec. ¶ 138.)

4.      Reaction to Powers's Stomach Condition

Powers's stomach issues caused him to pass gas in the Bus Control Center, which led to complaints from other employees. (See Powers Dep. 216:2-5). Waddell testified in her deposition that Powers regularly passed gas and laughed about it. (Waddell Dep. 24.) Waddell also referred in her deposition to Powers's "blatant flatulence." (Waddell Dep. 29.) Powers testified that Waddell somehow became aware of his stomach condition after he confided in Benson about it. (Powers Dep. 352.) Waddell then gave Powers the nickname "diapers"—partly due to his stomach condition and partly, as discussed below, due to his frequent complaints to Benson and Washington. (Powers Dep. 168.)

**D.      Powers's Informal Complaints Regarding Waddell**

Powers stated in his declaration that "multiple times each month" between August 2017 and his termination he reported Waddell's conduct to various supervisors including Director Benson, Assistant Director Locks, and Deputy Chief Washington. (Powers Dec. ¶¶ 40, 43-45, 78, 130.) By the spring of 2018, he had "discussed [these] ongoing issues with [Washington] at least twelve times." (Powers Dec. ¶ 79.) He had also "asked [Benson] for help at least twenty times" and "asked [Locks] for help at least twenty times." (Powers Dec. ¶¶ 80-81.)

4

### E.   Powers's Formal Complaint to SEPTA's EEO

1.   Written Complaint

On November 24, 2017, Powers submitted a written complaint to SEPTA's internal Equal Employment Office (EEO). (Powers Ex. E.) The complaint focused on Waddell, and, in particular, an incident on October 25, 2017 in which Waddell allegedly said "he [referring to Powers] has one more time not to give me my calls and we are going to have a problem," which Powers interpreted as a threat. (Powers Ex. E at 00093.)

Powers's written EEO complaint did not explicitly mention discrimination or retaliation. It also did not mention the nickname "boy" that Powers contends "is racist." Nevertheless, Powers now contends that his EEO complaint implicitly referenced discrimination because it stated that Powers was in a "hostile work environment" (although it did not state that the environment was hostile in a way that was discriminatory). (Powers Ex. E at 00093.) Powers also argues that by mentioning prior reports to supervisors, the complaint implicitly referenced retaliation—although, again, the complaint did not state that any adverse action was taken in response to these reports. (Powers Facts ¶ 31.)

2.   In-Person Follow-Up

On January 5, 2018, Powers met with SEPTA's EEO in person regarding his prior written complaint. (Powers Dep. 264.) During the January 5 visit, Powers informed the EEO about nicknames that had been given him (such as "snitch," "baby," "crybaby," and "diapers"). (Powers Dec. ¶ 134.) Powers also spoke with the EEO about what he believed were "Waddell's race-based comments." (Powers Dec. ¶ 137.) Specifically, Powers stated that he told the EEO about Waddell's use of the term "boy." (Powers Dec. ¶ 139.)

3.      Benson's Reaction

Powers testified that Benson found out right away that he had complained to the EEO. Benson allegedly made a comment about Powers speaking to "Tommy" (referring to EEO employee Tom Comber), then smirked at Powers and walked away. (Powers Dep. 248.)

4.      Outcome

No one from SEPTA's EEO spoke to Waddell or Locks about Powers's EEO complaint. (Waddell Dep. 54; Locks Dep. 153.) The EEO ultimately determined that "no further action [would] be taken" on Powers's complaint because a "review and investigation … revealed that although mutual unprofessional behavior may have occurred it did not rise to the level of harassment or hostile work environment." (Powers Ex. I.)

**F.      Treatment of Powers Following His Formal and Informal Complaints**

Powers claims he received various forms of negative treatment after complaining about Waddell's behavior to the various individuals within SEPTA described above.

1.      Attitude

According to Powers, when he first began reporting Waddell's harassment to Benson in the summer of 2017, Benson became "visibly angry with" him. (Powers Dec. ¶ 40.) Powers also stated that Benson would argue with him when he asked for help with Waddell's "offensive conduct and comments" and told him that he was "wrong" and should "stop reporting" Waddell. (Powers Dec. ¶¶ 41-42.) When Powers complained to Assistant Director Locks, Locks told him to "man up" and "handle the situation." (Powers Dep. 164.)

2.      Nicknames

Powers testified that Waddell gave him the nickname "diapers" in part because he kept "going back and talking to the director" and "acting like a crybaby." (Powers Dep. 168.) Powers also testified that he received the nicknames "crybaby" and "snitch," but did not specify which

employees gave him these nicknames. (Powers Dep. 166; Powers Dec. ¶ 127.) Powers does not provide an exact date for when these nicknames started, but testified that they "started initially after I reported the harassment." (Powers Dep. 169.)

          3.     Denial of Overtime, Move-Ups, and Backfill Duties

Powers also testified that, following his complaints about Waddell, he started being denied perks that included overtime, "move-ups," and backfill duties.

**Method of Assignment**   Bus Control Center Managers like Powers and Waddell were potentially eligible for perks that included overtime and "move-ups"—in which employees had an opportunity to change schedules when other employees were running late or needed assistance. (Defendants' Facts ¶ 11; Waddell Dep. 88:7-12.) The parties agree that these opportunities were assigned by Assistant Directors. (Powers's Dec. ¶ 33.) But the parties disagree as to whether these assignments were discretionary. According to Powers, overtime and move-ups were "supposed to be distributed based on rotation and seniority." (Powers Dec. ¶ 23; Powers Dep. 359.) Seniority was based on the number of years an employee had worked in the Bus Control Center. (Defendant's Facts ¶ 12.)

**Alleged Denial**   Powers stated in his declaration that after he "began complaining about and reporting discrimination and harassment in the workplace[,] Defendants began to deny [him] the ability to work overtime and move-ups." (Powers Dec. ¶ 24.) Powers also stated that he was passed over for backfill duties. (Powers Dec. ¶ 25.) Specifically, Powers testified that he would be "skipp[ed] over" such that the person next in seniority to him would receive the privilege. (Powers Dep. 359.) According to Powers, he "was the only person who was consistently being skipped and denied overtime, move-ups, and assignment of the Backfill position." (Powers Dec. ¶ 144.)

Powers takes particular issue with instances in which Waddell received these privileges when he did not, testifying that "they" tended to give overtime to Waddell and that he would be

"skipped over" in favor of Waddell. (Powers Dep. 240, 302.) However, Powers concedes that Waddell was ahead of him in seniority for Backfill duties (although he disputes the exact order). (Defendant's Facts ¶ 13.) Powers also does not appear to dispute that Waddell started in the Bus Control Center before him, making her more senior for overtime and move-ups. (See Powers Facts ¶ 10; Powers Dec. ¶ 18.) It is thus unclear why Powers believes he should have received these privileges over Waddell.

Powers also complains about decisions Waddell made when acting as a backfill. Specifically, according to Powers, Waddell would assign overtime and movements to other employees when these perks should have gone to him under the "standard procedure." (Powers Dec. ¶ 27.) Waddell would also skip over him for backfill duties and assign them to someone less senior. (Powers Dec. ¶ 29.) Powers does not identify any specific dates on which Waddell made these assignments, nor does he identify the specific less senior employees that Waddell assigned these benefits to. Powers stated that Waddell began to make these assignments "after [he] reported her disparaging conduct and comments to which she subjected [him] beginning in Spring of 2017." (Powers Dec. ¶ 30.) This is also around the same time that Powers first became eligible for backfill duties.

Powers inquired of Shawn Ragin (who was apparently an Assistant Director) about the schedule for overtime and move-ups. Ragin responded that he tried to follow a rotation, but was not "bound" by it. (Powers's Ex. C.)

### G.    One-Day Suspension

On April 12, 2018, an interaction occurred between Powers and Waddell for which Powers ultimately received a one-day suspension without pay.

### 1.    Alleged Conduct

As Powers describes the incident, he was talking to fellow employee Brandon Mayrant when Waddell attempted to walk between them. (Powers Dep. 225-26.) Powers then "flagged her off and walked off," at which point Waddell started jumping on the floor and yelling "come see me," conduct Powers interpreted as challenging him to a fight. (Powers Dep. 226-27.) In a witness statement, Mayrant provided an account largely consistent with Powers's. (Powers Ex. L.)

### 2.    Meeting with Benson

After the incident, Benson held a meeting with Powers, Waddell, and some other Bus Control Center employees. (Powers Dep. 232.) According to Powers, Benson "downplayed" Waddell's comments and suggested that by saying "come see me," Waddell was "probably asking [Powers] to come talk to her in a meeting." (Powers Dep. 232.) Powers disagreed with Benson's interpretation, to which Benson responded, "unfortunately, I don't speak hood." (Powers Dep. 232-33.) Powers then told Benson that this comment was racist and that just because he is a black man, it did not mean that he was "from the hood." (Powers Dep. 233.)

### 3.    Complaint to Washington

Powers complained to Deputy Chief Washington (Benson's supervisor) about Benson's "hood" comment. According to Powers, Washington agreed that Benson's comment "was racist," "wrong," and "discriminatory." (Powers Dec. ¶¶ 47, 61, 64.) Washington scheduled a meeting with Benson, Waddell, Washington, and Powers. (Powers Dec. ¶ 66.) At the meeting, Benson was "visibly angry" with Powers for complaining to Washington and refused to "even look at" Powers. (Powers Dec. ¶¶ 69-70.)

### 4.    Suspension Paperwork

Benson issued Powers a one-day suspension for the April 12, 2018 interaction between Powers and Waddell. In a document dated April 18, 2018, Benson set out the rationale for the

suspension, which also referenced past conflicts between Powers and Waddell. (Powers Ex. M.) According to Benson, these conflicts had caused a "disruption to Operations." (Powers Ex. M at 000102.)

Benson's report also made the following statement about past attempts to remedy conflicts between Powers and Waddell:

> On various occasions we have discussed the unprofessional behavior displayed by you in regard to Ms. Waddell. You have met with Employee Relations Manager Thomas Comber on January 5th. You also met with Asst. Director Arthur Locks, Asst. Director Carol Robinson, Asst. Director Shawn Ragin, Deputy Chief Officer Aleta [Washington] and me repeatedly and still the behavior has continued.

(Powers Ex. M at 000102.) In briefing on the present motion, Powers notes that, although the above paragraph is phrased as if it recounts discipline for unprofessional behavior, the incidents described actually consisted of Powers's own complaints. Notably, the paragraph references Powers's January 5, 2018 meeting with EEO manager Thomas Comber to discuss Waddell's alleged harassment. The paragraph also mentions a meeting between Powers and Washington, which is notable because Benson drafted this document around the time Powers complained to Washington about Benson's "I don't speak hood" comment.

### 5.   Waddell's Suspension and Grievance

Benson issued a similar one-day suspension to Waddell for the April 12, 2018 incident. Waddell testified that she filed a grievance and, following a process that involved a negotiation between Benson and the union representative, did not serve the suspension. (Waddell Dep. 92-93.)[2]

---

[2] Waddell characterized the infraction as "not giving the information to one another as backfills." Although unclear from Waddell's testimony, the parties agree that Waddell was referring to the same incident Powers testified about. (See Defendant's Facts ¶ 43.)

6.    Powers's Attempted Grievance, Transfer Request, and Withdrawal of Grievance

Like Waddell, Powers also attempted to challenge the one-day suspension. (See Powers Ex. N; Powers Dep. 86-87.)[3] But Powers's attempt to grieve his suspension was not successful—in his view, because Benson interfered. Specifically, sometime after the April 12, 2018 incident, Powers sought to transfer out of the Bus Control Center to the Video Evidence Unit, a move Benson had authority to approve or deny. (Powers Dec. ¶¶ 93-100.) Benson told Powers that she would not approve his transfer unless he served the suspension. (Powers Dec. ¶ 95.) According to Powers, had it not been for Benson's interference, he could have grieved the suspension and transferred to a different department. (Powers Dec. ¶ 96.) Powers ultimately served the suspension. (Powers Dec. ¶ 100.)

**H.    Complaint to the Pennsylvania Human Relations Commission**

Powers submitted a complaint to Pennsylvania's Human Relations Commission (which oversees workplace discrimination issues in Pennsylvania) on April 24, 2018. (Powers's Ex. K.) Powers does not offer evidence that any Defendant was aware of this complaint.

**I.    Alleged Sabotage and Termination**

1.    Benson's Discovery of the "Store and Forward Messages"

SEPTA's Bus Control Center used a system of messages—called "Store and Forward Messages"—"to deliver messages to all of the [bus drivers]. For example, when there [were] adverse weather conditions system-wide, Store and Forward messages [would] be sent to all of the [bus drivers] to advise them of these weather conditions." (Defendants' Facts ¶ 47.)

---

[3] The parties dispute whether competent evidence supports that Powers actually filed a grievance or merely inquired about filing one. For present purposes, this distinction is immaterial.

In the summer of 2018, Powers transferred out of Benson's department to the Video Evidence Unit. Shortly thereafter, on June 6, 2018, Benson happened to notice certain Store and Forward Messages in SEPTA's Computer Aided Radio Dispatch (CARD) system—allegedly put there by Powers. (Powers Ex. F.) Benson determined that the Store and Forward Messages were created on May 29, 2018 at 11:35 a.m. The messages were scheduled to "go into effect" on June 10, 2018, at which time all 1,037 bus drivers would be directed to contact the Bus Control Center at the same time—with "catastrophic" results. (Powers Ex. F at 00001.) Benson's report notes that Powers denied entering the Store and Forward Messages. Benson recommended Powers's "immediate termination." (Id. at 00002.)

2.      Alleged Significance

Although Benson described the effect of the Store and Forward Messages as "catastrophic," Powers disagrees. According to Powers, a Store and Forward Message will not go into effect unless approved by a supervisor, and, therefore, assuming no supervisor would approve these messages, no bus driver would ever see them. (Powers Dec. ¶ 106-07.) While denying that he entered these messages, Powers states that even if the messages had gone out, they would have been sent over the course of 6.5 hours, not all at once. (Powers Dec. ¶ 157.) Powers also notes that Locks testified that he, personally, would not have fired Powers over the Store and Forward Messages. (Locks Dep. 109-10.)

3.      Grievance and Termination

Powers filed a grievance over Benson's recommendation that he be terminated, but it was denied. Powers was ultimately discharged on September 27, 2018. (Defendant's Facts ¶ 61.)

4.    <u>Whether Powers Actually Entered the Store and Forward Messages</u>

Although Powers has consistently maintained that he did not actually enter the Store and Forward Messages into SEPTA's CARD system, this denial is complicated by a Request for Admission (RFA) that Powers apparently did not respond to.

**<u>Defendants' Request for an Admission</u>**   Defendants represent that on May 21, 2020, they served the following Request for an Admission (RFA) on Powers under Federal Rule of Civil Procedure 36:

> Admit that on May 29, 2018 at 11:35 a.m., you entered the 14 Store and Forward Messages into the CARD System using your log-on information. <u>See</u> Ex. A at pp1-2, Attachments 1-2.

(D.'s Exs. at 0004.) Powers agrees that he "received" this RFA (on an unspecified date) and also represents that he "answered" the RFA on September 24, 2020—with a denial. However, Powers does not state that his answer was <u>sent to defense counsel</u>, and Powers's counsel states that he was "unaware Defendants did not receive the Admission responses." (Powers's Facts ¶ 60.)[4] Powers attaches a screenshot showing metadata of a document containing his RFA responses, which shows a "created" and "last saved" date of September 24, 2020 and a "last printed" date of June 9, 2020. (Powers Ex. T.)[5]

---

[4] This statement is hard to reconcile with defense counsel's January 28, 2021 communication reminding Powers's counsel of the outstanding RFA.

[5] Powers filed his initial complaint on October 8, 2019 and an amended complaint on January 7, 2020. (ECF Nos. 1 and 8.) Defendants move to partially dismiss the amended complaint on January 21, 2020. (ECF Nos. 9 and 10.) On April 23, 2020, the Honorable Karen Marston entered a schedule for discovery to take place while the partial motion to dismiss was pending, setting the deadline for fact discovery at September 21, 2020. (ECF No. 20.) On August 7, 2020, this case was reassigned to me. (ECF No. 23.) I subsequently vacated Judge Marston's scheduling order on August 10, 2020 but did not enter a new one at that time. (ECF No. 24.) Thus, it appears that at the time Powers drafted, but failed to send, his denial, no discovery schedule was in place.

On August 27, 2020, I denied the pending motion to dismiss without prejudice and directed the parties to meet and confer and for Powers to file a second amended complaint if necessary. (ECF No. 28.) Powers filed a second amended complaint on October 16, 2020 and a third amended

In his statement of facts, Powers requests that any admission be deemed withdrawn. Powers did not file a motion to withdraw the Store and Forward Message admission pursuant to Rule 36(b). In their reply brief, Defendants assert that Powers's was not diligent in requesting to withdraw the admission—pointing out that Powers's attorney "refused to respond" to a letter and subsequent emails regarding outstanding RFA responses and did not object to Defendants' prior statement to the Court in the context of a discovery dispute that they considered the RFAs admitted. (Defendants' Reply at 9 n.9.)

**Powers's Interrogatory Response**   Defendants also served an interrogatory, requesting Powers to:

> Identify and describe the information you requested during the grievance and appellate process that would prove you were innocent and your termination was pretext and how Defendant Benson understood exactly what you were

---

complaint on October 29, 2020. (ECF Nos. 33 and 37.) Further motion practice on the pleadings was resolved by an order on June 23, 2021. (ECF No. 48.) A scheduling order was then entered on August 17, 2021.

Defendants first notified Powers of the outstanding RFA responses and other discovery deficiencies on January 28, 2021. (See Letter, attached at ECF No. 46-1.) Plaintiff's counsel did not respond to that correspondence despite repeated requests. (See ECF No. 46-2.) On April 16, 2021, Defendants raised various other discovery disputes with the Court by way of a letter. (ECF No. 46.) In that letter, Defendants noted they were not seeking relief as to the RFAs because they were "deemed admitted." (Id. at n.1.) Plaintiff did not file a response to that letter and no order was entered regarding the RFA. As noted, no discovery schedule was in place at that time.

It does not appear that the issue of the RFAs was raised again until Defendants' motion for summary judgment. Defendants' counsel asked Powers in deposition on November 30, 2021:

> Q. Now, you don't deny that they did find this Store and Forward message, right?
>
> A. They found it. I don't deny that.
>
> Q. Right. You just deny that you're the one who put it in there?
>
> A. Yes. I didn't put it in there.

(Powers Dep. 314:24-315:8.) The attached portions of the transcript do not reveal whether either party raised the issue of the RFA at that time.

> requesting and refused to provide it, as alleged in Paragraphs 181 and 182 of the
> First Amended Complaint.

(Powers Ex. G at 8-9.) Powers responded, in part, that "[a]ll evidence in this matter indicates

Mr. Powers was not involved in the Store and Forward Message which Defendants used to support

Mr. Powers' unlawful termination." (Id.)

**Powers's Testimony**   Powers testified in his deposition that he "didn't put [the Store and

Forward Messages] in there." (Powers Dep. 315.) In his declaration, Powers similarly stated that

he had "nothing at all to do with" the Store and Forward Messages. (Powers Dec. ¶ 152.) Powers

testified that at the time the messages were entered, he had gotten up from his desk and that he

asked another employee to cover his desk during that time. (Powers Dep. 341-42.)

**Documentary Evidence**   Defendants attach a mostly illegible screenshot that they claim

shows a record of the Store and Forward Messages. (Defendants' Exs. at 0104.) Although this

evidence is difficult to interpret, Powers does not seem to dispute that the Store and Forward

Messages were entered or that his login credentials were used to enter them—rather, Powers

disputes that he was the one who used his login credentials to enter the messages. (See, e.g., Powers

Dep. 315-16.)

As for evidence about who entered the Store and Forward Messages, both parties rely

principally on timing. The parties agree that Powers was on the floor and logged into his computer

at the date and time in question—May 29, 2018 at 11:35 a.m. (Powers Dep. 323.) For reasons

Defendants do not explain, Benson's report states that Powers was logged into his workstation

from 5:29 a.m. through 9:18 p.m., but Powers was only "on the clock" that day from 5:49 a.m. to

1:56 p.m. (Compare Powers's Ex. F with Defendants' Facts ¶ 52.) Defendants produced a

document that purportedly shows a log of two "incidents" Powers handled on May 29, 2018 (the

day in question): one incident was "created" at 11:21 a.m. and "closed" at 11:24 a.m, and the other

15

was "created" at 11:12 a.m. and "closed" at 11:57 a.m. (Defendants' Exs. at 0104-0106.) In Defendants' interpretation, this log shows that Powers was working at his desk around the time that the Store and Forward Messages were entered. Powers disagrees: in his view, the long gap between the second incident being "created" (at 11:12) and "closed" (at 11:57) suggests that he was not at his desk from 11:24 until 11:57, during which time the messages were sent.

Powers also points to logs of calls that came in for the bus route he managed (SEPTA's "Southern" route) during the morning of May 29, 2018. The first two calls were handled by Powers, but the next two were handled by another employee, Dawn Odom. (Locks Dep. 80-81, 84.) The second call Odom handled was at 11:36 a.m., just two minutes after the Store and Forward Messages were allegedly put into the system. (Locks Dep. 81.) Assistant Director Arthur Locks testified that one reason Odom might have answered those calls is that Powers was not at his desk. (Locks Dep. 85.)

**Who Else May Have Entered the Messages**   Powers argues that he was "set up" to prevent him from leaving the Bus Control Center for another department or otherwise to get him in trouble. (Powers Dep. 318.) Powers notes the "suspicious" coincidence that just after he left Benson's department, she found the Store and Forward Messages and "knew exactly where to find them." (Powers Dep. 321.)

Powers also suggested in deposition testimony that Marcus James, an employee who had just started in the department, may have helped Benson with the set-up. (Powers Dep. 329-32.) According to Powers, James may have been under Benson's "influence" and had a "way to make sure that [Benson] was well taken care of." (Powers Dep. 331-32.) And Powers considers it "suspicious" that James started backfill training during Powers's grievance process. (Powers Dep.

331.) James (a black man himself) had also apparently accused Powers of not "dress[ing] how a black man should dress." (Powers Dep. 330.)

## II.   PROCEDURAL HISTORY

Based on the above facts, Powers has brought claims against SEPTA, Benson, Waddell, and Locks for race, gender, and disability discrimination, as well as for retaliation, against all Defendants. Defendants previously moved to dismiss some of these claims at the pleadings stage, wherein the following claims were dismissed: (1) claims for punitive damages against the individual Defendants; (2) claims based on allegations of a hostile work environment; (3) claims for disparate treatment based on gender; (4) claims for failure to accommodate Powers's disability; (5) state-law claims against Waddell; and (6) Powers's 42 U.S.C. § 1981 race discrimination claim against Locks.

Presently, the remaining claims are: (1) a § 1981 race discrimination claim against Waddell; (2) a § 1981 race discrimination claim against Benson; (3) a Title VII race discrimination claim against SEPTA; (4) an ADA disability discrimination claim against SEPTA; (5) Title VII and ADA retaliation claims against SEPTA; (6) state-law race and disability discrimination claims against Benson, Locks, and SEPTA; and (7) state-law retaliation claims against Benson and Locks.

## III.   LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if there is evidence from which a reasonable factfinder could return a verdict for the non-moving party, and a dispute is "material" if it might affect the outcome of the case under governing law. Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). The court must view the evidence in the light most favorable to the non-moving party. Galena v. Leone, 638 F.3d 186, 196 (3d

Cir. 2011). However, "unsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. Schaar v. Lehigh Valley Health Servs., Inc., 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010) (citing Williams v. Borough of W. Chester, Pa., 891 F.2d 458, 461 (3d Cir. 1989)).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial Celotex burden can be met by showing that the non-moving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case." Id. at 322.

After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut the moving party's claim by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" that show a genuine issue of material fact or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1)(A).

IV.   **DISCUSSION**

A.      **"Sham Affidavit" Doctrine**

In opposition to Defendants' motion for summary judgment, Powers attached a 160-paragraph declaration in support of his claims of discrimination and retaliation. Defendants argue that the entirety of Powers's declaration should be disregarded under the "sham affidavit" doctrine. "A sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary

judgment." Jiminez v. All Am. Rathskeller, Inc., 503 F.3d 247, 253 (3d Cir. 2007). "[I]f it is clear that an affidavit is offered solely for the purpose of defeating summary judgment, it is proper for the trial judge to conclude that no reasonable jury could accord that affidavit evidentiary weight and that summary judgment is appropriate." Id. Defendants argue that Powers's declaration qualifies as a sham affidavit because it contradicts his deposition testimony in significant ways as follows:

First, Defendants point out that Powers states in his declaration that he told Washington about Benson's "I don't speak hood" comment but did not testify to this fact in his deposition. However, Defendants do not claim to have questioned Powers about this fact in his deposition, and it thus does not appear that there is an actual contradiction. To the extent Defendants complain that Powers's statements are "self-serving," there is no general prohibition on a party supporting its case with self-serving testimony. See Kirleis v. Dickie, McCamey & Chilcote, P.C., 560 F.3d 156, 161-62 (3d Cir. 2009). It is true that "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment." Id. at 161 (emphasis added). But while many paragraphs in Powers's declaration are conclusory and thus properly disregarded, Powers's statements about reporting Benson's "I don't speak hood" comment to Washington are specific and within Powers's personal knowledge. And although Washington's opinion that Benson's comment "was racist" might be hearsay if offered to show that the comment was, in fact, racist, it is not hearsay if offered to show only that Powers made this report and that Benson may have retaliated against him for it. See Fed. R. Evid. 801(c)(2).[6]

---

[6] I thus need not decide whether Washington's opinion on Benson's comment might fit into a hearsay exception.

Second, Defendants object to Powers's declaration statements that he pursued a grievance over his one-day suspension. But again, Defendants do not point to any contradictory testimony from Powers's deposition. In fact, at his deposition Powers did (albeit inartfully) reference his attempt to grieve his one-day suspension:

> The suspension that I received was unwarranted and I wasn't allowed to fight it. When I tried to transfer out of the bus control department, [Benson] told me she wouldn't sign-off on my transfer unless I served a suspension. That's why my suspension is on my last day, on a Friday, and my first day is Monday in a new department. Which was against policy because the union rep told her that I'm allowed to fight my suspension—the suspension. Even going into the new position, she still refused to sign off on it. So I had no choice but to serve the suspension.

(Powers Dep. 86-87.) The above testimony is somewhat consistent with Powers's declaration— except, possibly, as to whether there was a formal grievance or merely an informal request to a union representative. That distinction is immaterial for purposes of the present motion for summary judgment.

Finally, Defendants accuse Powers of "backtrack[ing] from his assertions that Marcus James was the culprit" in planting the Store and Forward Messages in SEPTA's CARD system "and now claim[ing] that Benson enlisted James to sabotage [Powers]." (Defendants' Reply at 7 n.7.) It is not clear that the sham affidavit doctrine would apply to this issue. Who entered the messages is more a theory of the case than a fact about which Powers claims to have personal knowledge—Powers did not testify to having personally witnessed either James or Benson enter the Store and Forward Messages. In any event, this theory is contained in Powers's deposition testimony. (See Powers Dep 331:8-17.)

I therefore decline to disregard Powers's declaration in its entirety under the sham affidavit doctrine. Instead, I will consider Powers's declaration in light of his prior deposition testimony

and mindful of the Third Circuit's edict that "prior depositions are more reliable than affidavits." Jiminez, 503 F.3d at 253.[7]

### B.    Request for Admission Regarding Store and Forward Messages

A threshold consideration in evaluating Powers's termination and Defendants' motion for summary judgment is what effect to give to Powers's repeated failure to respond to a request that he admit to entering the Store and Forward Messages that ultimately formed the basis for his termination. Federal Rule of Civil Procedure 36(a)(3) plainly states that if a request for admission is served and not responded to, it is deemed admitted. Powers does not dispute that Defendants asked him to admit to entering the store and forward messages. He also does not deny that he failed to respond. Powers's contention that he "answered" the admission on his counsel's computer without sending that answer to defense counsel is unavailing and irrelevant. While Powers states that his "counsel was unaware Defendants did not receive the Admission responses," Powers does not dispute that Defendants twice reminded his counsel of it by way of a letter on January 28, 2021 and a court filing on April 16, 2021. Accordingly, pursuant to Rule 36(a)(3), Powers has admitted to entering the Store and Forward Messages.

"A matter admitted under [Rule 36] is conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." Fed. R. Civ. P. 36(b). "Subject to Rule 16(e) [regarding modification of scheduling orders], the court may permit withdrawal or amendment if it would promote the presentation of the merits of the action and if the court is not persuaded that it would prejudice the requesting party in maintaining or defending the action on the merits." Id.

---

[7] Defendants are correct that Powers's declaration contains numerous conclusory statements and that such statements should be disregarded at summary judgment. Kirleis, 560 F.3d at 161. Accordingly, I have not considered paragraphs from Powers's declaration that merely assert facts in a conclusory fashion or for which there is no indication that Powers has the requisite personal knowledge.

Buried in Powers's response to Defendants' statement of facts is a request to withdraw his admission to sending the Store and Forward Messages. Powers has not made a formal motion under Rule 36(b). In support of withdrawing the admission, Powers relies on the fact that he has stated in other forms of discovery (such as answers to interrogatories) that he did not enter the Store and Forward Messages.

In understandably opposing Powers's request to withdraw the admission, Defendants do not object to the fact that Powers failed to make a formal motion as required by Rule 36(b). Defendants also do not press that withdrawing Powers's admission would prejudice them or fail to "promote the presentation of the merits of the action." Instead, Defendants rely on the fact that Powers's attorney showed a concerning lack of diligence in raising this issue, including by ignoring Defendants' multiple reminders that failure to respond would result in a deemed admission. On this point, I readily agree with Defendants.

Although a motion is required to withdraw an admission under Rule 35(b), a district court has discretion to "treat [a] … brief requesting that [an] admission[] be withdrawn as [such] a 'motion.'" Percella v. City of Bayonne, No. 21-1504, 2022 WL 2207832, at *3 (3d Cir. June 21, 2022) (not precedential). Generally, "it would accord with best practices for a district court, upon receipt of a request for the court to withdraw admissions on its own motion, to invite the requesting party to make its own motion under Rule 36(b) or at least give the parties notice of its intent to treat the request as a Rule 36(b) motion and to invite a response from the affected party." Id. at n.3. Because Defendants do not object to Powers's failure to make a motion, and because Defendants have responded in substance to Powers's request in their reply brief, I will consider Powers's request to withdraw his admission on the merits.

Powers's request to withdraw his admission presents a close, and frustrating, call. Not only did Powers's counsel fail to respond when Defendants reminded him of the outstanding admissions response, but additionally Powers's counsel has not even now made the required motion under Rule 35(b). Defendants are therefore correct that Powers's counsel has shown a lack of diligence with respect to this issue.

I am, however, constrained to conclude that both prongs of Rule 36(b) are met. First, withdrawal of the admission would "promote the presentation of the merits" because it relates to a central—perhaps the central—issue in this case. "The purpose of [requests for admission under] F.R.Civ.P. 36(a) is to expedite trial by eliminating the necessity of proving undisputed and peripheral issues" rather than "to establish facts which are obviously in dispute," particularly on a "question … central to [the] case." Kosta v. Connolly, 709 F. Supp. 592, 594-95 (E.D. Pa. 1989). "It is preferable for the parties to win or lose on the substance, rather than through procedural default." McNulty v. Middle East Forum, No. 19-cv-5029, 2021 WL 5050085, at *3 (E.D. Pa. Nov. 1, 2021) (citing Poulis v. State Farm Fire & Cas. Co., 747 F.2d 863, 869 (3d Cir. 1984)).

Moreover, Defendants do not argue that withdrawal of Powers's admission would case prejudice. "[C]ourts are reluctant to preclude withdrawal of a default admission when the admission stems from counsel's inadequate discovery and case management procedures, rather than the party's conduct, and the opposing party is not prejudiced by the failure." McNulty, 2021 WL 5050085, at *5. "The prejudice contemplated by Rule 36(b) … is not simply that the party who obtained the admission now has to convince the jury of its truth. Something more is required." Gwynn v. City of Philadelphia, 719 F.3d 295, 299 (3d Cir. 2013). Defendants were aware that Powers disputed sending the Store and Forward Messages, and a significant portion of Powers's and Locks's deposition testimony was devoted to this issue. Relevant documents were produced,

including logs from SEPTA's CARD system. Thus, there is no indication that Defendants would have taken additional discovery had Powers complied with his obligation to serve his denial.

Based on these considerations, I find that Powers has met the standard required by Rule 35(b) and will grant Powers's request to withdraw his admission to entering the Store and Forward Messages. The remainder of Defendants' summary judgment motion is analyzed on that basis.[8]

### C.     Disability Discrimination (SEPTA, Benson, and Locks)

The Americans with Disabilities Act (ADA) makes it unlawful for an employer to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).[9]

#### 1.     Whether Powers Had a Disability

To prove disability discrimination, Powers must first establish that a factfinder could conclude that he had a disability or was regarded as having one. Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999). Powers does not argue he was "regarded as" having a disability, and I therefore consider only whether Powers can show that his stomach condition qualifies as "a disability."

A disability is any physical impairment that "substantially limits one or more … major life activities." 42 U.S.C. § 12102(1)(A). "[T]o establish a statutorily protected disability, the employee must show that she has an impairment; identify the life activity that she claims is limited

---

[8] Given Powers's attorney's disregard for deadlines set forth in the Federal Rules of Civil Procedure, Defendants may consider filing a request for costs caused by Powers's attorney's failure to respond to the request for admission. See McNulty, 2021 WL 5050085, at *6 (permitting admission to be withdrawn but requiring counsel to pay costs caused by failure to respond).

[9] The Pennsylvania Human Relations Act (PHRA) contains similar prohibitions and the parties agree that these claims may be analyzed "identical[ly]" to Powers's federal claims. See Jones v. Se. Pa. Transp. Auth., 796 F.3d 323, 327 (3d Cir. 2015).

by the impairment; and prove that the limitation is substantial." Fiscus v. Wal-Mart Stores, Inc., 385 F.3d 378, 382 (3d Cir. 2004). This standard "is not meant to be … demanding." 29 C.F.R. § 1630.2(j)(1)(i). "[T]he determination of whether an impairment substantially limits a major life activity requires an individualized assessment." Ramsay v. Nat'l Bd. of Med. Examiners, 968 F.3d 251, 260 (3d Cir. 2020) (quoting 28 C.F.R. § 36.105(d)(1)(vi)). "To undertake that individualized assessment, courts have required some evidence of the plaintiff's substantial limitation—even when the limitation seems self-evident in context." Alston v. Park Pleasant, Inc., 679 F. App'x 169, 172 (3d Cir. 2017).[10]

Powers contends that his disability consisted of undiagnosed stomach issues that substantially limited his ability to "eat." (Powers Dec. ¶ 160.) Other than Powers's unexplained assertion that the limitation on his ability to eat was "substantial[]," his evidence consists of his testimony that he had to avoid certain foods, that he had to use the bathroom frequently, and that if he ate the wrong things he would get diarrhea and flatulence. (Powers Dep. 129, 345-47.) This evidence is too nonspecific for a jury to assess whether Powers's dietary restrictions were substantial. Although the standard is "not … demanding," Powers has given no indication of the number of foods he could not eat or the frequency or severity of his symptoms. I therefore conclude that Powers's has not raised a dispute of fact as to whether he had a disability.

---

[10] Defendants rely on cases that applied an outdated—and more demanding—standard requiring a plaintiff to demonstrate the "frequency, severity, [and] permanency" of an impairment. See Weidow v. Scranton Sch. Dist., 460 F. App'x 181, 186 (3d Cir. 2012); Palish v. K & K RX Servs., L.P., No. 13-cv-4092, 2014 WL 2692489 (E.D. Pa. June 13, 2014); Griffin v. United Parcel Serv., Inc., 661 F.3d 216 (5th Cir. 2011). In the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553, Congress expanded the definition of "disability" and found that courts had "interpreted the term 'substantially limits' to require a greater degree of limitation than was intended by Congress." Pub. L. No. 110-325, § 2(a)(6). Under current guidance from the Equal Employment Opportunity Commission (EEOC), the "[c]ondition, manner, [and] duration" of an impairment are still relevant but are not the sole considerations. See 29 C.F.R. § 1630.2(j)(4).

2.   <u>Whether Powers Was Subject to Discrimination Based on His Alleged Disability</u>

Although I have concluded that Powers did not have a disability, in an abundance of caution I will consider whether, assuming Powers had a disability, he has raised a dispute of fact as to whether any Defendant discriminated against him on the basis of it. For the following reasons, I conclude that he has not.

A plaintiff may prove disability discrimination under the burden-shifting framework of <u>McDonnell Douglass Corporation v. Green</u>, 411 U.S. 792 (1973). <u>See</u> <u>Walton v. Mental Health Ass'n. of Se. Pennsylvania</u>, 168 F.3d 661, 668 (3d Cir. 1999). Under that framework, a plaintiff first has the burden to establish a prima facie case of discrimination. <u>McDonnell Douglass</u>, 411 U.S. at 802. The burden then shifts to the employer to offer a legitimate, nondiscriminatory reason for its action. <u>Id.</u> Finally, the plaintiff has the burden to show that the offered reason is pretextual and that the real reason for the employer's conduct was prohibited discrimination. <u>Id.</u> at 802-04.

To make out a prima facie case, a plaintiff must show that: (1) he belongs to a protected class, (2) he was qualified for the position she held, (3) he was subject to an adverse employment action, and (4) "under circumstances that raise an inference of discriminatory action, the employer continued to seek out individuals with qualifications similar to the plaintiff's to fill the position." <u>Sarullo v. United States Postal Service</u>, 352 F.3d 789, 797 (3d Cir. 2003). "The burden of establishing a prima facie case of disparate treatment is not onerous." <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981). For example, a terminated employee can make out the fourth element by showing that the position was later filled by someone not of the protected class. <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 506 (1993). An inference of discrimination can also arise from evidence of similar discrimination against other employees. <u>Golod v. Bank of America Corp.</u>, 403 F. App'x 699, 702 n.2 (3d Cir. 2010).

Powers claims that Waddell discriminated against him based on his disability when she assigned perks such as overtime, move-ups, and backfill duties to less senior employees instead of him. Powers does not offer any specific instances of Waddell making these assignments or indicate which specific less senior employees Waddell gave these perks too. Rather, Powers complains generally about Waddell's assignment of Control Center duties during the fall of 2017 and the spring of 2018. The only evidence that these assignments may have been discriminatory is that Waddell complained of Powers's "blatant flatulence." Neither party offers evidence as to whether the less senior employees who received overtime, move-ups, or backfill duties had disabilities. Powers's general complaint about work assignments made at unspecified times to unspecified employees under unspecified circumstances is simply too vague to raise an inference that Waddell must have discriminated against Powers on the basis of disability just because she complained about his flatulence.

The same applies to Arthur Locks. Powers has offered no evidence that Locks took any adverse action against him "under circumstances that raise an inference of discriminatory action." Sarullo, 352 F.3d at 797. The only adverse actions Locks may have taken against Powers would have been unspecified assignments of overtime, move-ups, and backfill duties, but Powers gives no reason to believe that his alleged disability may have played a role in those decisions.

As for Benson, Powers offers no evidence that his alleged disability played any role in either Benson's decision to suspend him or to fire him. While Benson was aware of Powers's stomach condition, the circumstances of Powers's one-day suspension (which stemmed from a verbal interaction with Waddell) and termination (which followed Benson's alleged discovery of the Store and Forward Messages) do not suggest that his stomach condition had any bearing on

27

them. Powers has therefore not made out a prima facie case that Benson engaged in disability discrimination.

### D.    Race Discrimination (SEPTA, Waddell, Benson, and Locks)

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Liability for employment discrimination based on race under 42 U.S.C. § 1981 may be analyzed under the same standard as race discrimination claims under Title VII. Fullard v. Argus Rsch. Labs., Inc., No. 00-cv-509, 2001 WL 632932, at *2 (E.D. Pa. June 6, 2001). The McDonnell Douglass burden shifting framework may be applied to these claims. Jones v. Sch. Dist. of Philadelphia, 198 F.3d 403, 410 (3d Cir. 1999).[11]

#### 1.    Adverse Actions by Waddell

Powers claims Waddell discriminated against him on the basis of his race in her assignment of overtime, move-ups, and Backfill duties to less senior employees. It appears undisputed that whichever employees received these perks over Powers were also black. (See Defendants' Facts ¶¶ 2, 4, 23, 25-26, 45-46, 58.)[12] Powers claims that Waddell's assignments were discriminatory because she called him "boy," a term Powers alleges was "racist." (Powers Dec. ¶ 138.)

---

[11] Powers's PHRA claims follow the same analysis. See Jones, 796 F.3d at 327.

[12] Powers objects to these statements solely on the ground that the race of other employees is irrelevant—but it is plainly relevant to determining whether Plaintiff can show that "others not in the protected class were treated more favorably." Weldon v. Kraft, Inc., 896 F.2d 793, 797 (3d Cir. 1990); see also Anderson v. Wachovia Mortg. Corp., 621 F.3d 261, 268-69 (3d Cir. 2010) (comparative treatment is not "essential" but is "highly probative"). Because Plaintiff does not properly refute that all these employees were black, I will treat these facts as undisputed. See Fed. R. Civ. P. 56(e).

As with Powers's claims of disability discrimination, his evidence of race discrimination by Waddell is simply too vague to make out a prima facie case. The only evidence that Waddell harbored any racial animus toward Powers is that she called him "boy." Powers offers no reason why Waddell would carry out this alleged racial animus by assigning Control Center perks to other, unspecified employees who were also (like Powers and Waddell) black. Race discrimination claims based on actions taken by Waddell must therefore be dismissed.

2.   <u>Adverse Actions by Locks</u>

Powers has also offered no reason to believe that race played a role in Locks's unspecified assignments of overtime, move-ups, and backfill duties to less senior employees. Thus, all claims with respect to actions by Locks must be dismissed.

3.   <u>Adverse Actions by Benson</u>

As the Director of Bus Operations, Benson was not involved in assigning overtime, move-ups, or backfill duties. (Powers Dec. ¶ 39.) The only adverse actions Powers claims Benson subjected him to were: (1) a one-day suspension for fighting with Waddell; and (2) termination, allegedly based on the Store and Forward Messages.

Powers offers a comment Benson made during a meeting regarding the interaction between him and Waddell. Specifically, in response to Powers's description of Waddell's statements, Benson allegedly told Powers "I don't speak hood." Viewing this comment in the light most favorable to Powers, I agree that a factfinder could interpret Benson's "hood" comment as reflecting racial bias. The fact that Benson technically used the word "hood" to refer to <u>Waddell's</u> speech—not Powers's—is not necessarily fatal to Powers's claim, because the comment could imply that Powers would understand "hood" phrases because he is black. Benson suspended Powers and Waddell (both black employees) right after she made the comment, based on the interactions described in the comment.

29

Defendants cite Ewell v. NBA Properties, Inc., 94 F. Supp. 3d 612 (D.N.J. 2015), for the proposition that "an isolated or stray remark" is insufficient to make out a prima facie case of discrimination. Id. at 624. But Ewell involved a racially insensitive remark made ten years before the challenged adverse employment action. Id. at 623. Here, Benson made the "hood" comment about the incident that was used to justify Powers's suspension. "When considering whether stray remarks are probative of discrimination, the Court considers three factors: (1) the relationship of the speaker to the employee and within the corporate hierarchy; (2) the purpose and content of the statement; and (3) the temporal proximity of the statement to the adverse employment decision." Stites v. Alan Ritchey, Inc., No. 09-cv-392, 2011 WL 81076, at *8 (E.D. Pa. Jan. 10, 2011), aff'd, 458 F. App'x 110 (3d Cir. 2012). Here, those factors arguably point in Powers's favor.[13]

Although Powers's evidence of racial animus is thin, a jury would not be prohibited from finding an inference of discrimination based on Benson's comment describing Powers's and Waddell's interaction as "hood," which was followed by suspending Powers for that interaction. Powers has accordingly made out a prima facie case that his one-day suspension occurred "under circumstances that raise an inference of discriminatory action." Sarullo, 352 F.3d at 797.

Defendants' proffered legitimate, non-discriminatory reason for the suspension is Benson's conclusion that Powers "engaged in [an] argument on the Control Center floor with Ms. Waddell causing a disruption to Operations." (Powers Ex. M. at 000102.) Powers does not dispute that this reason, if true, would be legitimate and non-discriminatory. Thus, Powers must demonstrate that the reason is pretextual.

---

[13] Defendants also argue that the fact that Benson issued a similar suspension to another black employee (Waddell) somehow negates an inference that Powers's own suspension was discriminatory. A jury could view this evidence as further racially discriminatory conduct.

To establish pretext, "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir 1994). Powers's evidence of pretext consists substantially of his testimony—corroborated by Mayrant's witness statement—that he did not actually do or say anything sanctionable in his interaction with Waddell. The issue is not whether Benson's decision to discipline Powers was "correct[] or not," because even a mistaken reason can be legitimate and non-discriminatory. Ewell, 94 F. Supp. 3d at 622. But "weak reasons … might suggest an inference that they were not the real reasons," id., and Benson was allegedly informed of Powers's (and Mayrant's) account in the subsequent meeting, yet continued to accuse Powers of "engag[ing] in an argument" and "disrupt[ing] … Operations."[14] Viewing this evidence in the light most favorable to Powers, and keeping in mind the Third Circuit's edict that the summary judgment standard "is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues," Powers may be able to convince a factfinder that Benson's reason for issuing him a one-day suspension was pretextual. Stewart v. Rutgers, The State Univ., 120 F.3d 426 (3d Cir. 1997). Thus Powers's race discrimination claims regarding his one-day suspension will survive summary judgment.

---

[14] Defendants object that Mayrant's witness statement is "inadmissible hearsay." (Defendants' Reply at 3.) This is incorrect for two reasons. First, Mayrant's statement is not hearsay if offered to show what information was available to Benson when deciding whether to suspend Powers. Second, even if Mayrant's statement were hearsay in its present form, Defendants have not argued that it is not "capable of being admissible at trial"—e.g. by calling Mayrant as a witness. See Fraternal Order of Police, Lodge 1 v. City of Camden, 842 F.3d 231, 238 (3d Cir. 2016) (emphasis deleted).

I reach a different result regarding Powers's termination. Unlike with the one-day suspension, Benson's allegedly racially biased comment was not close in time or otherwise connected to her decision to fire him. And Powers has offered no other evidence that race played any role in Benson's decision. Thus, Powers has not made out a prima facie case of race discrimination with respect to his termination.

  **E.**   **Retaliation Claims (SEPTA, Benson, and Locks)**

Title VII prohibits an employer from discriminating against an employee because the employee "has opposed any practice made an unlawful employment practice by" Title VII or because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under" Title VII. 42 U.S.C. § 2000e-3(a). The ADA contains a similar prohibition on retaliating against an employee for exercising the rights afforded by the statute. 42 U.S.C. § 12203. The parties agree that Powers's state-law retaliation claims are analogous to these federal claims. See Woodson, 109 F.3d at 920.

As with discrimination, a plaintiff may proceed on a retaliation claim based on circumstantial evidence under the McDonnell Douglas framework. See Moore v. City of Philadelphia, 461 F.3d 331, 342 (3d Cir. 2006). A prima facie case of retaliation consists of a showing that: (1) the employee engaged in protected activity; (2) the employer took an adverse action against the employee; and (3) there was a causal connection between the protected activity and the adverse action. Id. at 340-41.

  1.   Protected Activity

Defendants argue that Powers did not engage in protected activity. Although Powers made numerous complaints about the way he was treated, Defendants contend that Powers's complaints did not reference discrimination and thus did not "oppose[] any practice made an unlawful" by federal or state discrimination laws. See 42 U.S.C. § 2000e-3(a). The one exception is Powers's

complaint to the Pennsylvania Human Relations Commission, but Defendants argue, and I agree, that there is no evidence that Defendants were aware of this complaint.

"[P]rotesting what an employee believes in good faith to be a discriminatory practice is clearly protected conduct." Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1085 (3d Cir. 1996). "Thus, a plaintiff need not prove the merits of the underlying discrimination complaint, but only that he was acting under a good faith, reasonable belief that a violation existed." Id. (quotation marks omitted). Protected activity "includes not only an employee's filing of formal charges of discrimination against an employer but also informal protests of discriminatory employment practices, including making complaints to management." Daniels v. Sch. Dist. of Philadelphia, 776 F.3d 181, 193 (3d Cir. 2015) (quotation marks omitted).

But "complain[ts] about unfair treatment in general and express[ions] [of] … dissatisfaction" that "do[] not specifically complain about … discrimination" are not protected. Barber v. CSX Distribution Servs., 68 F.3d 694, 701-02 (3d Cir. 1995) (ADEA case); Slagle v. County of Clarion, 435 F.3d 262, 266 (3d Cir. 2006) (same standard under Title VII). Rather, a protected complaint "must allege that the opposition was to discrimination based on a protected category, such as age or race." Daniels v. Sch. Dist. of Philadelphia, 776 F.3d 181, 193 (3d Cir. 2015). "In considering what activities constitute protected conduct, [the Third Circuit has] emphasize[d] that anti-discrimination employment statutes are not intended to establish general standards for conduct of employers in dealing with employees." Id. at 195.

Powers's complaints consisted of: (1) informal complaints to Benson, Locks, and Washington regarding Waddell's conduct; (2) a written complaint regarding Waddell that Powers made to SEPTA's EEO; (3) a follow-up in-person meeting with SEPTA's EEO regarding Waddell; and (4) an in-person complaint to Washington regarding Benson's "I don't speak hood" comment.

**Informal Complaints About Waddell**   Powers has provided very little information about what exactly he said to Benson, Locks, and Washington about Waddell's conduct, other than that he did not like the way Waddell treated him. Powers has argued that one nickname Waddell used for him—"boy"—had racist connotations, but he has not offered evidence that he either told his supervisors about the nickname "boy" or that he informed them of its racial meaning. Powers has therefore not offered sufficient evidence to raise a dispute of fact regarding whether his informal complaints to management about Waddell's conduct were protected activity.

**Written EEO Complaint**   Powers's written EEO complaint presents a closer question. The complaint was submitted to SEPTA's "Equal Employment Office," potentially implying that whatever actions were complained of were not "equal" treatment. But the complaint did not explicitly reference discrimination, nor did it mention Powers's race, gender, or alleged disability. Powers did use the phrase "hostile work environment" and reference prior informal complaints, although he did not state that any hostility was based on his protected characteristics or that those prior complaints were about discrimination. In the complaint to SEPTA's EEO, Powers hypothesized that Waddell mistreated him because she "ha[d] some type of resentment or fe[lt] intimidated by [his] presence," in particular because he "was successful with [his] results with the interview for Assistant Director of Control Center" and "became qualified for a backfill quicker than most of the people that are in the position already." (Powers's Ex. E at 00094.) Thus, Powers's surmised that Waddell "[saw] [him] as some type of obstacle." (Id.)

I conclude that Powers cannot demonstrate a dispute of fact as to whether his written EEO complaint constituted protected activity. The actual reason the complaint gives for Waddell's conduct—jealousy of Powers's career advancement—dispels any implication that the phrase "hostile work environment" silently suggested discrimination based on race, sex, or disability.

Powers's EEO complaint did not "allege … discrimination based on a protected category," and was, therefore, not protected activity. Daniels, 776 F.3d at 193.

**In-Person EEO Meeting**   According to Powers, he did tell SEPTA's EEO about the nicknames "snitch, baby, crybaby, and diapers," and Waddell's allegedly racist habit of calling him "boy," during a January 2018 in-person meeting with EEO manager Tom Comber. (Powers Dec. ¶¶ 134-39.)

One of those accusations requires special consideration. Defendants argue that even if Powers subjectively believed Waddell meant "boy" in a racist way, it was not "overtly" racist. But the Supreme Court has held that it was error to assume "that the term ['boy'], standing alone, is always benign." Ash v. Tyson Foods, Inc., 546 U.S. 454, 456 (2006) (per curiam). Instead, "context, inflection, tone of voice, local custom, and historical usage" could influence the term's meaning. Id. The context in Ash was a manager using the term for a subordinate, whereas here Waddell and Powers were on the same level and both were black. (The race of the manager in Ash is not mentioned.) But as I am required to give Powers the benefit of all inferences, a jury could conclude that Powers's belief that the term was racist was sufficiently reasonable to make his complaint protected activity.

A possibly more significant problem with Powers's January 2018 meeting with Comber is that even if Powers brought up racial remarks, it is unclear whether Powers complained that adverse actions were taken against him in connection with those remarks. In Clark County School District v. Breeden, 532 U.S. 268 (2001) (per curiam), the Supreme Court held that a complaint of a single sexual comment was not protected activity because "[n]o reasonable person could have believed that the single incident" constituted a hostile work environment or otherwise altered the terms and conditions of the plaintiff's employment. Id. at 271. Powers does not specifically claim

that he told Comber that Waddell was denying him overtime, move-ups, or backfill duties based on his race, gender, disability, or history of complaints to management. Powers's allegations are therefore thin, but, viewing the evidence in the light most favorable to him, a factfinder could infer that Comber would connect Powers's in-person statements to his prior written complaint referencing ongoing conduct by Waddell that made him "uncomfortable" and that he characterized as a "hostile work environment." Thus, a factfinder could conclude that Powers's in-person complaint to SEPTA's EEO in January 2018 was protected activity.

**In-Person Complaint to Washington**   Finally, Powers's in-person complaint to Washington did explicitly reference the racial nature of Benson's remark. But it is unclear whether Powers specifically complained that Benson was subjecting him to adverse treatment in connection with that remark. Context is informative: Benson was characterizing Powers's and Waddell's statements to each other as "speak[ing] hood" and threatening to discipline them based on those statements—discipline that was later imposed. Putting these facts together, a jury could infer that Powers's complaint to Washington was protected activity.

2.      Adverse Actions and Causal Nexus

Powers must next show that adverse actions were taken following his protected activity and that these actions were causally connected to the protected activity. Powers alleges several adverse actions, which I consider below.

**Denial of Overtime, Move-Ups, and Backfill Duties**   Powers claims that he was passed over for overtime, move-ups, and backfill duties in retaliation for complaining to Benson, Washington, and SEPTA's EEO about Waddell. As to assignments made by Locks, there is no evidence that retaliation played any role in Locks's decision-making. Retaliation claims based on Locks's actions must therefore be dismissed. There is also no evidence that Benson took part in

assigning overtime, move-ups, and backfill duties, so claims based on Benson's actions are insufficient to the extent they rely on assignments of these Control Center perks.

A closer question is presented as to assignments by Waddell. Powers has pointed to evidence that Waddell regarded his complaints to management disdainfully—reflected by the nicknames "diapers," "crybaby," and "snitch." Powers also stated in his declaration that Waddell passed him over for overtime, move-ups, and backfill duties. Although Powers does not say exactly when these assignments occurred, he states generally that Waddell started denying him these perks after he complained about her in the summer of 2017.

But I have previously concluded that until January 2018, Powers did not engage in protected activity. Thus, to make out a retaliation claim based on Waddell's conduct, Powers would have to show that Waddell retaliated against him for his January 2018 meeting with Comber or his April 2018 complaint to Washington. There is no evidence to support either. It is unclear if Waddell even knew about Powers's January 2018 in-person meeting with SEPTA's EEO, but even if she did, Powers has offered no reason to believe that Waddell altered her conduct in response to this meeting—rather, it appears that Powers is generally dissatisfied with the way Waddell treated him from the summer of 2017 onward. A similar observation applies to Powers's April 2018 meeting with Washington. For that reason, Powers cannot make out a prima facie case that Waddell engaged in retaliation.

**One-Day Suspension**   Powers claims that Benson subjected him to a one-day suspension in part out of retaliation for Powers's protected complaints of discrimination. I first consider whether Powers can make out a prima facie case of retaliation. Defendants do not dispute that Powers's one-day suspension was an adverse employment action or that it occurred after Powers complained to SEPTA's EEO in January 2018 and after Powers complained to Washington about

Benson's "I don't speak hood" comment. Defendants do dispute whether these were protected activities, but I have already concluded that a factual dispute precludes resolution of that question. Thus, the only remaining issue is whether Powers can show "a causal connection" between these allegedly protected activities and Benson's decision to suspend him. Hinkle v. City of Wilmington, 205 F. Supp. 3d 558, 573 (D. Del. 2016).

To show that Benson may have acted with a retaliatory motive, Powers relies primarily on Benson's attitude toward Powers's complaints in general. First, when Powers returned from meeting with SEPTA's EEO, Benson allegedly "smirked" at him. (Powers Dep. 248.) Second, and more significantly, when Washington called a meeting with Benson and Powers to discuss the "I don't speak hood" comment, Benson was "visibly angry" with Powers and refused to "even look at" him. (Powers Dec. ¶¶ 69-70.)

To this evidence, Powers adds the somewhat unusual way that his suspension came about. Initially, Benson suspended both Powers and Waddell. Waddell then filed a grievance and was excused from her suspension. But when Powers tried to do the same, Benson allegedly told Powers that she would not approve his transfer to another department unless he served the suspension.

Finally, Powers points out that in the paperwork recommending suspension, Benson referred to some of Power's protected activities—including Powers's complaints to SEPTA's EEO and Washington—as if they were incidents of discipline directed at Powers. This fact could suggest that Benson did not appreciate Powers complaining of discrimination.

Putting these facts together, they could suggest a causal nexus sufficient to make out a prima facie case of retaliation. The burden thus shifts to Defendants to offer a legitimate, non-discriminatory reason for the suspension.

According to Defendants, Benson suspended Powers because he "engaged in [an] argument" with Waddell. (Powers's Ex. M at 000102.) However, several facts could lead a jury to conclude that this explanation is pretextual. First, Defendants have not explained why Benson refused to let Powers participate in the ordinary grievance process—as Waddell was permitted to do. Thus, even if Benson had a legitimate, non-discriminatory reason for imposing the suspension in the first place, it is not clear that Defendants have offered a legitimate, non-discriminatory reason for conditioning Powers's transfer on withdrawal of his grievance. It is also not immediately obvious why the conduct described in Mayrant's witness statement—walking away to sit in a chair by the wall—would lead Benson to conclude that a suspension was appropriate. See Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 320 (3d Cir. 2000) ("Subjective evaluations are more susceptible of abuse and more likely to mask pretext." (alteration omitted)). Finally, as noted, a jury could read Benson's discipline statement as chastising Powers for speaking to Washington—Benson's supervisor.

Accordingly, summary judgment is not appropriate on Powers's retaliation claims with respect to his one-day suspension.

**Termination**   To make out a prima facie case that his firing was retaliatory, Powers must show that there is a causal connection between one of the protected activities described earlier and his eventual termination. Moore, 461 F.3d at 340-41. Powers does not identify which specific protected activity he is relying on. Instead, Powers appears to refer generally to all complaints from the summer of 2017 onward. Most of these complaints were not close in time or otherwise connected to his termination. There is no indication, for example, that Benson even considered Powers's early informal complaints about Waddell's behavior when deciding to terminate him.

(And, as noted, Powers offers no evidence that Benson was aware he had submitted a charge of discrimination to the Pennsylvania Human Relations Commission.)

Nevertheless, I conclude that Powers has made out a prima facie case that his termination was causally related to his complaint to Washington about Benson's "I don't speak hood" comment. I start by assuming that a jury would credit Powers's testimony that he did not enter the Store and Forward messages in SEPTA's CARD system. If Powers did not enter the messages, it follows either that someone else did or that Benson was lying when she claimed to have found them. It would not be unreasonable for a jury to infer the latter given the evidence of recent conflict between Powers and Benson. While Defendants argue that Powers should be bound to his earlier speculation that fellow employee Marcus James, not Benson, was the culprit, this is not a fair characterization of Powers's deposition testimony, which noted the "suspicious" coincidence that Benson found the Store and Forward Messages "the first day" after his transfer and "knew exactly where to find" them. (Powers Dep. 333:1-5.)

Next, Powers has evidence that Benson was hostile toward Powers's complaints of discrimination on multiple occasions—including refusing to "even look at" Powers during a meeting with Washington, smirking at Powers after he met with EEO manager Tom Comber, and recharacterizing Powers's meeting with Comber as a form of discipline. (Powers Dec. ¶¶ 69-70; Powers Dep. 248; Powers's Ex. M.) Although most of these incidents of hostility were temporally remote from Powers's termination, the connection is shortened by the fact that Benson claimed to have discovered the Store and Forward Messages soon after an episode in which Benson refused to let Powers transfer unless he withdrew a grievance related to his suspension—conduct that I have already determined could be viewed as retaliatory. Together, these facts could create an inference that Benson invented the Store and Forward Messages as retaliation for Powers's prior

complaint to Washington. Although this inference is thin, the burden of making out a prima facie case is "not onerous." <u>Carvalho-Grevious v. Delaware State Univ.</u>, 851 F.3d 249, 259 (3d Cir. 2017). Mindful that Powers is entitled to all inferences in his favor at this stage of the proceedings, I cannot say that Powers is necessarily foreclosed from showing that Benson acted with a retaliatory motive.

As for a legitimate, non-discriminatory reason, Defendants claim Powers was fired because he engaged in an act of sabotage—by entering the Store and Forward Messages. This reason, if true, would plainly be legitimate and non-discriminatory. Powers must therefore show that it is pretextual.

Again on the issue of pretext, a jury could accept Powers's testimony that he did not enter the Store and Forward Messages. Once that is accepted, a jury could infer that Benson's reliance on those messages was pretextual. Defendants object that Benson had, at most, a "mistaken but honest belief" as to who entered the Store and Forward Messages. <u>Capps v. Mondelez Glob., LLC</u>, 847 F.3d 144, 154 (3d Cir. 2017). That may be so, but this point is still disputed: if Powers did not enter the messages, and Benson is the only one who claims to have found them, it would not be unreasonable to infer that Benson (as opposed to, say, Marcus James) invented them. Defendants' interpretation of documentary evidence is not so obvious as to render it beyond dispute that the messages were entered on May 29, 2018 without Benson's knowledge.

Thus, I conclude that summary judgment must be denied as to Powers's claim that his termination constituted unlawful retaliation under Title VII and the PHRA.

### F.   Statute of Limitations

Defendants argue that certain claims should be dismissed as untimely. Most of the claims that Defendants contend are untimely—including all claims against Locks and Waddell—are also deficient for other reasons discussed above, making it unnecessary to consider timeliness. The only

claims for which there is a remaining dispute as to timeliness are Powers's claims against Benson personally (as opposed to SEPTA as an entity) under the PHRA regarding his one-day suspension.

Powers filed a charge of discrimination related to the events in this lawsuit with the Equal Employment Opportunity Commission (EEOC) and Pennsylvania Human Relations Commission (PHRC) on July 23, 2018. (Defendants' Facts ¶ 64.) This first charge was only against SEPTA. (Id.) On October 25, 2018, Powers filed an amended charge, this time including Benson and other individual respondents. (Defendants' Facts ¶ 65.)[15] "To bring suit under the PHRA, a plaintiff must first have filed an administrative complaint with the PHRC within 180 days of the alleged act of discrimination." Woodson v. Scott Paper Co., 109 F.3d 913, 925 (3d Cir. 1997). For Powers's claims against Benson personally, that 180-day period began on April 28, 2018. Benson's written statement authorizing Powers's one-day suspension is dated April 18, 2018, just shy of the limitations period. (Powers's Ex. M.) However, Powers did not actually serve this suspension until several months later—which he claims was because Benson refused to allow him to grieve the suspension. A jury could therefore conclude that some of the actions Benson took to impose this suspension occurred within the limitations period, and summary judgment on this ground is not appropriate.

## V.    CONCLUSION

For the reasons set out above, Defendants' motion for summary judgment will be granted in part. The motion will be denied as to Powers's race discrimination and retaliation claims against SEPTA and Benson regarding his one-day suspension, and Powers's retaliation claims against SEPTA and Benson regarding his termination.

---

[15] Powers responds to these facts with "Admitted in part, denied in part" without explaining the part that is denied or citing contrary evidence. Because this denial is improper, I will treat the dates that Powers filed these charges as undisputed. See Fed. R. Civ. P. 56(c)(1), (e).

An appropriate order follows.